COMMODITIES EXPORT COMPANY v CITY OF DETROIT

Docket No. 55545. Submitted March 9, 1982, at Detroit.—Decided May 4, 1982.

Employees of Commodities Export Company, a seller of duty-free goods to persons bound for Ontario, Canada, distributed commercial handbills in the area surrounding the approach to the American side of the Ambassador Bridge. The bridge, which connects Detroit with Windsor, is owned, operated and maintained by the Detroit international Bridge Company (DIBCO). DIBCO also has jurisdiction over the approaches to the bridge known as the Bridge Plaza areas. Ammex, Incorporated, leases property in the Bridge Plaza from DIBCO for the purposes of selling duty-free merchandise. After being told by employees of DIBCO and Ammex to cease distributing the handbills, the employees of Commodities were arrested by the Detroit police and charged with trespass on private property. Subsequently, the charges were dismissed. Commodities, thereafter, filed suit in Wayne Circuit Court against the City of Detroit, Ammex, Gary E. Barbeau, manager of the Ammex store, DIBCO, and Roy G. Lancaster, president of DIBCO, seeking a preliminary injunction allowing them to distribute the handbills in the Bridge Plaza areas. The court, Roland L. Olzark, J., determined that the plaintiff did not have a right to distribute commercial handbills on the Ambassador Bridge or plaza areas because the bridge was private property for all purposes other than transportation to and from Canada. The court granted summary judgment for the defendants. Pending entry of the judgment, the plaintiff moved to amend its complaint. The court denied the motion to amend and the judgment was entered. The plaintiff appeals alleging that: (1) the Ambassador Bridge is a public highway and its employees are entitled to enter the bridge property to distribute commercial handbills; (2) even if

REFERENCES FOR POINTS IN HEADNOTES
[1, 2] 16A Am Jur 2d, Constitutional Law §§ 409, 497-505, 517-519. 63 Am Jur 2d, Property § 10.
[3] 39 Am Jur 2d, Highways, Streets, and Bridges §§ 11, 12, 48, 80.
[4] 61A Am Jur 2d, Pleading § 306 et seq.
[5] 61A Am Jur 2d, Pleading §§ 310, 314.

the bridge is private property, employees of Commodities are entitled to distribute handbills pursuant to their right to freedom of speech; (3) because the Ambassador Bridge and plaza areas are subject to the provisions of the Michigan Vehicle Code regarding parking on bridges customers of Ammex must comply with the provisions; and (4) that the trial court erred in denying the plaintiff's motion to amend its complaint. *Held:*

1. The Ambassador Bridge is public only in the limited capacity as a route for transportation over the Detroit river. Otherwise, it constitutes private property. Here, the bridge is privately owned and operated, albeit under the auspices of a legislative grant. Because the plaintiff does not seek to use the bridge in its public capacity, the defendants may properly prohibit the plaintiff's distribution of handbills on that basis.

2. The rights surrounding private property ownership, where the public is invited on the property for a limited purpose, should not be extinguished where the alleged activity involving the right to freedom of speech does not comport with the public nature of the property. This is especially true where the speech involved is commercial handbilling. In addition, here political speech is not at stake and no state regulation is involved.

3. The plaintiff's contention that the Ambassador Bridge and property leased to Ammex is subject to the parking provisions of the Michigan Vehicle Code is without merit because the bridge is not a highway as defined in the code.

4. The trial judge did not abuse his discretion in denying the plaintiff's motion to amend its complaint.

Affirmed.

1. PROPERTY — FREE SPEECH — PUBLIC INVITATION.

Property does not lose its private character merely because the public is generally invited to use it for designated purposes in balancing one party's constitutional right of free speech versus another party's right to enjoy his private property.

2. PROPERTY — PUBLIC USE FOR LIMITED PURPOSE — HANDBILLING.

The rights surrounding private property ownership, where the public is invited on the property for a limited purpose, should not be extinguished when the alleged activity involving the right to free speech does not comport with the public nature of the property; this is especially true where the speech involved is commercial handbilling.

3. BRIDGES — HIGHWAYS — MOTOR VEHICLES.

A bridge connecting the United States with Canada is not subject to the restrictions of the prohibited parking provisions of the

Michigan Vehicle Code where the bridge is not a highway as defined by the statute because it is not publicly maintained (MCL 257.20, 257.674a; MSA 9.1820, 9.2374[1]).

4. PARTIES — AMENDMENT OF COMPLAINT — COURT RULES.
   A party to a lawsuit should freely be granted leave to amend his pleadings where justice so requires (GCR 1963, 117.3, 118.1).

5. MOTIONS AND ORDERS — AMENDMENT OF PLEADINGS.
   Generally, the grant or denial of a motion to amend pleadings will not be disturbed on appeal absent an abuse of discretion; however, a trial judge should not let his view of the merits of a case enter into the decision to grant or deny a motion.

*Lubienski, Lubienski & Lubienski,* for plaintiff.

*Butzel, Long, Gust, Klein & Van Zile,* for DIBCO and Roy G. Lancaster.

*Fischer, Franklin, Ford, Simon & Hogg,* for Ammex and Gary E. Barbeau.

Before: D. C. RILEY, P.J., and R. B. BURNS and S. EVERETT,* JJ.

R. B. BURNS, P.J. Plaintiff appeals from a summary judgment in favor of defendants. The summary judgment stemmed from a suit by plaintiff to bar defendants from interfering with the distribution of commercial handbills on the area surrounding the approach to the American side of the Ambassador Bridge.

Plaintiff operates Commodities Export Company which sells duty-free goods to motorists bound for Ontario, Canada. The Ambassador Bridge, which connects Detroit and Ontario, Canada, is owned, operated and maintained by Detroit International Bridge Company (DIBCO). DIBCO also has jurisdiction over the approaches to the bridge, known as the Bridge Plaza area. This area is composed of a

---

* Circuit judge, sitting on the Court of Appeals by assignment.

store and a parking lot. Defendant Ammex, Inc., leases property in the Bridge Plaza from defendant DIBCO for the purpose of selling duty-free merchandise. Commodities Export Company is located across the street[1] from the bridge entrance and the Bridge Plaza, where Ammex, Inc., is located. The two enterprises are vigorous competitors.

Two employees of Commodities Export Company distributed handbills to potential patrons of their competitor in the parking area leased by Ammex, Inc. The handbills advertised Commodities' business and prices. The employees were told by Ammex and DIBCO employees to cease distributing the handbills and to leave the parking lot. The handbilling activity persisted for approximately three hours, at which point the employees of Commodities Export were arrested by the Detroit police. They were charged with trespass on private property. The next day the charges were dropped.

The plaintiff sought a preliminary injunction against defendants. The trial court determined that plaintiff did not have a right to distribute commercial handbills on the Ambassador Bridge because the bridge was private property for purposes other than transportation to and from Canada. Two years later, right before the scheduled trial date of this action, the defendants' motions for summary judgment were granted but not entered. Pending entry of the judgment, plaintiff moved to amend its complaint. The court denied leave to amend the complaint. The summary judgment was entered.

Plaintiff raises several issues on appeal. First, plaintiff argues that the Ambassador Bridge is a

[1] Commodities' primary place of business is a building at Porter and 21st Streets across from the bridge entrance. Commodities also operates a store from a temporary office trailer on the Fisher Freeway Service Drive south of the bridge.

public highway. Therefore, its employees are entitled to enter the bridge property to distribute commercial handbills on the area leased to Ammex, Inc. Alternatively, plaintiff argues that if the Ambassador Bridge and the area leased to Ammex is private property, nonetheless, its employees are entitled to distribute commercial handbills pursuant to their right of freedom of speech, guaranteed by the First Amendment of the United States Constitution, and art 1, § 5 of the Michigan Constitution.

The trial judge found that the bridge was public when it functioned as a transportation network. Those people who used the bridge for crossing to and from Canada were relying on the public character of the bridge. However, the bridge was classified as public only for the limited purpose of providing a route of transportation. For the purpose of any other conduct, the bridge reverted to being private property. We agree with the conclusion of the trial judge.

In *Donovan v Pennsylvania R Co,* 199 US 279; 26 S Ct 91; 50 L Ed 192 (1905), a private railway company leased property which was the site of the railroad. The railroad company granted a cab company the exclusive right to use the passenger station and depot grounds surrounding the station to service the railroad passengers. Plaintiff Donovan sought to infringe on the arrangement. They attempted to function out of the depot and congregated in the main entrances to the railway. The railroad company expressly objected to Donovan's actions. The Court in *Donovan,* discussing the chameleon nature of the disputed property rights, stated:

"Although its functions are public in their nature, the company holds the legal title to the property which

it has undertaken to employ in the discharge of those functions. And, as incident to ownership, it may use the property for the purposes of making profit for itself; such use, however, being always subject to the condition that the property must be devoted primarily to public objects, without discrimination among passengers and shippers, and not be so managed as to defeat these objects. It is required, under all circumstances, to do what may be reasonably necessary and suitable for the accommodation of passengers and shippers. But it is under no obligation to refrain from using its property to the best advantage of the public and of itself. It is not bound to so use its property that others, having no business with it, may make profit to themselves. *Its property is to be deemed, in every legal sense, private property as between it and those of the general public who have no occasion to use it for purposes of transportation.* In *Western Union Telegraph Co v Pennsylvania R Co,* 195 US 540; 25 S Ct 133; 49 L Ed 312 [1904], the court considered the nature of the interest which a railroad company had in its right of way. It was there said: 'A railroad's right of way has, therefore, the substantiality of the fee, and it is private property even to the public in all else but an interest and benefit in its uses. It cannot be invaded without guilt of trespass. It cannot be appropriated in whole or part except upon the payment of compensation. In other words, it is entitled to the protection of the Constitution, and in the precise manner in which protection is given.' " *Id.,* 294. (Emphasis added.)

We find that the *Donovan* case dictates the conclusion that the Ambassador Bridge is public only in the limited capacity as a vehicle for transportation across the river. Otherwise, it constitutes private property. Here, the bridge is privately owned and operated, albeit under the auspices of a legislative grant. The plaintiff does not seek to use the bridge in its public capacity. Rather, the real basis of the challenge is to defendant Ammex's right to realize a healthy profit from the entire

operation. This right specifically was upheld and afforded protection in *Donovan.*

The decision in *Detroit International Bridge Co v American Seed Co,* 249 Mich 289; 228 NW 791 (1930), does not alter our determination. In that case, the right of DIBCO to take the property for the construction of the bridge through eminent domain was challenged on the basis of whether the operation of a bridge constituted a public use. The Court did discuss the function of the would-be bridge, concluding that it would qualify as a public way when used for transportation. However, the thrust of the opinion dealt with the state's power to impose the restriction on the property that it become the situs of a bridge. The Court stated:

"The purpose of the bridge being inherently public, the failure to attach special conditions to the grant of power demonstrates that the legislature considered the supervision of tolls and the determination of their reasonableness by the Federal government sufficient to insure protection of the public from extortion." *Id.,* 299.

The decision did not, as the plaintiff asserts, determine that the character of the bridge was public for all purposes. The Court did state:

"It is true that hereafter plaintiff may amend its charter but, whatever the amendment, it cannot devote the property taken under the power of eminent domain to a private use. No express restrictions in the statute are required to preserve the public purpose. The obligation is implied from acceptance of the right.

\* \* \*

"Plaintiff, in exercising the power, irrevocably bound itself to the statutory public use of the property. As is conceded by counsel for plaintiff, it did not acquire the fee. It took only an easement for public purposes, and

failure of use for such purposes would work a reverter of the land." *Id.,* 296-297.

Nonetheless, this simply was in the context of concluding whether eminent domain was the proper mechanism to secure this property.

The next level of inquiry is whether, even though the Ambassador Bridge and Bridge Plaza are private property for non-transportation purposes, plaintiff is, by virtue of the First Amendment, still entitled to distribute commercial handbills on the premises. There are two conflicting constitutional rights that must be balanced here: the plaintiff's First Amendment rights and the defendants' rights under the Fifth and Fourteenth Amendments to enjoy their property.

The trial court, in the first opinion released regarding the summary judgment, cited *Lloyd Corp v Tanner,* 407 US 551; 92 S Ct 2219; 33 L Ed 2d 131 (1972), to support the determination that since the bridge area was private property the defendants properly could exclude plaintiff from distributing the commercial handbills. In the *Lloyd Corp* case protestors entered a privately owned mall to distribute anti-war handbills. The protestors argued that based on their First Amendment rights they could distribute handbills on private property. The Court rejected the argument and stated:

"The handbilling by respondents in the malls of Lloyd Center had no relation to any purpose for which the center was built and being used. It is nevertheless argued by respondents that, since the Center is open to the public, the private owner cannot enforce a restriction against handbilling on the premises.

\* \* \*

"Respondents' argument, even if otherwise meritori-

ous, misapprehends the scope of the invitation extended to the public. The invitation is to come to the Center to do business with the tenants. * * * There is no open-ended invitation to the public to use the Center for any and all purposes, however incompatible with the interests of both the stores and the shoppers whom they serve." (Footnote omitted.) *Id.,* 564-565.

The Court then concluded:

"It would be an unwarranted infringement of property rights to require them to yield to the exercise of First Amendment rights under circumstances where adequate alternative avenues of communication exist. Such an accommodation would diminish property rights without significantly enhancing the asserted right of free speech." *Id.,* 567.

Prior to the *Lloyd* decision, in *Amalgamated Food Employees v Logan Valley Plaza,* 391 US 308; 88 S Ct 1601; 20 L Ed 2d 603 (1968), the Supreme Court held that union members could picket a store located in a private mall despite instructions from the owner to leave the premises. The Court's rationale was that where the mall was open to the public it was the functional equivalent to a public business district in which such hand-billing is permissible. *Marsh v Alabama,* 326 US 501; 66 S Ct 276; 90 L Ed 265 (1946). However, *Lloyd* seriously eroded the precedential value of *Logan* and ultimately in *Hudgens v NLRB,* 424 US 507; 96 S Ct 1029; 47 L Ed 2d 196 (1976), *Logan* was overruled. The *Hudgens* case, which stemmed from labor picketing in a private mall, emphasized that the First Amendment only provides a guarantee against abridgement of free speech by the government. It was not properly relied on for action taken by a privately owned shopping center.

The most recent case in the sequel, *Pruneyard*

*Shopping Center v Robins,* 447 US 74; 100 S Ct 2035; 64 L Ed 2d 741 (1980), involved a group trying to solicit, in a private shopping center, support for opposition to the United Nations resolution against Zionism. There, the Court stated:

"[P]roperty does not lose its private character merely because the public is generally invited to use it for designated purposes." *Id.,* 81.

Nonetheless, *Pruneyard* upheld the group's right to solicit support in the private shopping center. However, *Pruneyard* does not undermine the continued validity of *Lloyd* or *Hudgens.* In *Pruneyard, supra,* 81, the Court stated:

"Our reasoning in *Lloyd,* however, does not *ex proprio vigore* limit the authority of the State to exercise its police power or its sovereign right to adopt in its own Constitution individual liberties more expansive than those conferred by the Federal Constitution. *Cooper v California,* 386 US 58, 62; 87 S Ct 788; 17 L Ed 2d 730 (1967)."

We conclude that *Pruneyard* dealt with the state's ability to extend the First Amendment rights of its inhabitants at the expense of the rights of private property owners.

Turning to Michigan precedent, plaintiff directs us to *Amalgamated Clothing Workers v Wonderland Shopping Center,* 370 Mich 547; 122 NW2d 785 (1963), to support its position. In *Amalgamated Clothing Workers,* handbills were distributed at the entranceways to the mall urging people not to purchase nonunion-made garments sold at a store in the center. The Court, because of a stalemate, in a four-to-four decision, affirmed the granting of the injunction by the lower court permitting the distribution of the union's leaflets. *Amalgamated*

*Clothing Workers* was decided prior to the United States Supreme Court decisions of *Logan Valley Plaza, Lloyd* and *Hudgens.* Although, at the time, the decision was consistent with the prevailing interpretation of First Amendment rights, the opinion does not accurately reflect the current law. Moreover, even the justices in *Amalgamated Clothing Workers* who favored affirmance of the injunction stated:

"Excepting by the indirection of diverting customers to other stores in search for union-made goods, plaintiff by such handbilling would sell no goods, and certainly by no stretch of wordplay would it sell or attempt to sell competitive goods in the Wonderland Center. Rather, by selling or 'educating' Wonderland shoppers to a fact as well as an idea conveyed by its handbill, plaintiff would discourage the purchase at 1 of the Wonderland stores of goods 'nonunion made.' Its purpose is informative and negative, albeit odious and repulsive depending on point of view. It constitutes no promotion on Wonderland's sidewalk of a competitive business." *Id.,* 572.

We conclude that the *Lloyd* and *Hudgens* cases control this case. The rights surrounding private property ownership, where the public is invited on the property for a limited purpose, cannot be extinguished when the activity does not comport with the public nature of the property. This is especially true where the speech involved is commercial handbilling.

In the past, the United States Supreme Court has accorded commercial speech less protection than other forms of constitutionally guaranteed speech. *Central Hudson Gas & Electric Corp v Public Service Comm of New York,* 447 US 557; 100 S Ct 2343; 65 L Ed 2d 341 (1980). Recently, First Amendment protections have been extended

to purely commercial speech. *Metromedia, Inc v San Diego,* — US —; 101 S Ct 2882; 69 L Ed 2d 800 (1981). However, in *Metromedia, Inc, supra,* 814, the Supreme Court made it clear that the distinction between commercial and noncommercial speech survives:

"Although the protection extended to commercial speech has continued to develop, commercial and noncommercial communications, in the context of the First Amendment, have been treated differently. * * * However, we continued to observe the distinction between commercial and noncommercial speech, indicating that the former could be forbidden and regulated in situations where the latter could not be. * * * In *Ohralik v Ohio Bar Ass'n,* 436 US 447; 98 S Ct 1912; 56 L Ed 2d 444 (1978), * * * we again recognized the common-sense and legal distinction between speech proposing a commercial transaction and other varieties of speech:

" 'To require a parity of constitutional protection for commercial and noncommercial speech alike could invite dilution, simply by a leveling process, of the force of the Amendment's guarantee with respect to the latter kind of speech. Rather than subject the First Amendment to such a devitalization, we instead have afforded commercial speech a limited measure of protection, commensurate with its subordinate position in the scale of First Amendment values, while allowing modes of regulation that might be impermissible in the realm of noncommercial expression.' 436 US 447, 456; 98 S Ct 1918; 56 L Ed 2d 444 (1978)."

Here, political speech is not at stake as was the case in *Pruneyard* and *Lloyd Corp v Tanner.* No state regulation is involved. Where decisions hold that even a public authority, against which the First Amendment protections are directed, has the right to reject commercial advertising, surely a private property owner's rights cannot be infringed by allowing unconsented-to commercial advertising on its premises.

Plaintiff raises two more issues on appeal. Plaintiff argues that the Ambassador Bridge and the property leased to defendant Ammex, Inc., is subject to MCL 257.674(1)(m); MSA 9.2374(1)(m), which prohibits parking on bridges. This contention is without merit.

MCL 257.674(1)(m); MSA 9.2374(1)(m) provides:

"257.674 Prohibited parking
"Sec. 674. (1) A vehicle shall not be parked, except if necessary to avoid conflict with other traffic or in compliance with the law or the directions of a police officer or traffic-control device, in any of the following places:

\*    \*    \*

"(m) Upon a bridge or other elevated highway structure or within a highway tunnel."

In addition, MCL 257.674a; MSA 9.2374(1) states:

"Sec. 674a. A vehicle shall not be parked in an area purchased, acquired or used as a clear vision area adjacent to or on a highway right of way. A person shall not conduct vending or other commercial enterprises in a clear vision area."

We find that pursuant to MCL 257.20; MSA 9.1820, the Ambassador Bridge is not subject to the provisions of the Michigan Vehicle Code. MCL 257.20; MSA 9.1820 defines highway as:

"Sec. 20. 'Highway or street' means the entire width between the boundary lines of every way publicly maintained when any part thereof is open to the use of the public for purposes of vehicular travel."

The Ambassador Bridge is not a highway as de-

fined in MCL 257.20; MSA 9.1820 because it is not publicly maintained. DIBCO incurs all the costs associated with the bridge. MCL 257.674a; MSA 9.2374(1) only applies to the parking of vehicles adjacent to or on a highway right of way. Moreover, the Michigan Vehicle Code does not apply to auto traffic on private property. *Zarzecki v Hatch,* 347 Mich 138; 79 NW2d 605 (1956). Therefore, the customers of Ammex can park their cars in the area allotted near the bridge.

The final issue raised is whether the trial judge erroneously denied plaintiff's motion to amend its complaint. When the summary judgment was granted, but before it was entered, plaintiff moved to amend its complaint. The amendment asserted that based on *Pruneyard Shopping Center v Robins, supra,* decided subsequently to filing the original complaint, even if the bridge was private property, plaintiff still had a First Amendment right to distribute its handbills. The trial judge, in an opinion denying the motion, stated the following reasons for his determination:

"While the plaintiff's motion here seeks to amend its complaint, the court feels the original complaint was sufficiently broad enough to include the claim it is making and, hence, no amendment is needed. The motion is, therefore denied both for the reason that the court does not feel that an amendment is necessary but, more importantly, even if such amendment was needed and granted, it still would not support the claim plaintiff has a First Amendment right to distribute the handbills advertising its business."

GCR 1963, 117.3 and GCR 1963, 118.1 provide that a party freely shall be granted leave to amend his pleadings when justice so requires. *Hanon v Barber,* 99 Mich App 851; 298 NW2d 866 (1980). The judge's disposition of an amendment to a com-

plaint will not be disturbed on appeal absent a finding of abuse of discretion. *Cobb v Mid-Continent Telephone Services Corp,* 90 Mich App 349; 282 NW2d 317 (1979).

A trial judge should not let his view of the merits of the case enter into the decision to grant or deny a motion. *Taylor Board of Education v Taylor Federation of Teachers,* 66 Mich App 695; 239 NW2d 713 (1976). Arguably, the discussion in the opinion of *Pruneyard Shopping Center v Robins, supra,* could support the conclusion that the judge reviewed the merits of plaintiff's amendment. However, in *Ben P Fyke & Sons v Gunter Co,* 390 Mich 649; 213 NW2d 134 (1973), the Court stated it was not an abuse of discretion for a judge to deny a motion when it would be futile to amend a complaint. Here, in effect, the judge said it would be futile to amend the complaint. The discussion of *Pruneyard* in the opinion sought to explain why the amendment would be futile. Therefore, the trial judge did not abuse his discretion.

Affirmed.