S.O.C., INC.; HILLSBORO ENTERPRISES, INC., AND HILLSBORO ENTERPRISES, LTD., APPELLANTS, *v.* THE MIRAGE CASINO-HOTEL, A NEVADA CORPORATION; AND TREASURE ISLAND CORP., A NEVADA CORPORATION, RESPONDENTS.

No. 34563

May 17, 2001         23 P.3d 243

[Rehearing denied October 2, 2001]

*Potter Law Offices,* Las Vegas, for Appellant S.O.C., Inc.

*JoNell Thomas,* Las Vegas, for Appellant Hillsboro Enterprises.

*Schreck Morris* and *Todd L. Bice* and *Matthew E. McCaughey*, Las Vegas, for Respondents.

*Allen Lichtenstein,* Las Vegas, for Amicus Curiae American Civil Liberties Union of Nevada.

## OPINION

By the Court, YOUNG, J.:

This case presents several issues related to the exclusion of commercial handbillers from property that is privately owned. We conclude that the district court did not err in making a preliminary determination that owners of private property may exclude commercial handbillers and such exclusion is not a violation of the Nevada or United States Constitutions.

## FACTS

S.O.C., Inc., Hillsboro Enterprises, Inc., and Hillsboro Enterprises, Ltd.,[1] are licensed corporations that provide referrals for erotic dance entertainment. The erotic entertainment services at issue are generally provided in hotel/motel rooms and are available in Clark County for a fee. A partially dressed or nude dancer is requested by telephone and then usually paid for by the person who views the performance.

The Mirage Casino-Hotel, a Nevada corporation, and Treasure Island Corporation, a Nevada corporation, are hotel-casinos located on real property in Clark County, Nevada, which is bordered by Las Vegas Boulevard South (commonly referred to as the "Strip"), Spring Mountain Road, Industrial Road, and private property known as Caesars Palace.

Along the front of the Mirage properties,[2] there are two sections of sidewalk owned by the Mirage. One of these sidewalks extends from Buccaneer Bay Boulevard (an interior driveway of the Mirage property) south to the Caesars Palace property. This sidewalk borders the water attraction at the Mirage and is parallel and adjacent to Las Vegas Boulevard. The other sidewalk extends from Buccaneer Bay Boulevard north to the corner of Spring Mountain Road and Las Vegas Boulevard. In keeping with the Treasure Island theme, this sidewalk is constructed principally of wooden planks and forms the front of the Treasure Island property line. The plank sidewalk is elevated several feet off the ground and is separated from Las Vegas Boulevard by a public sidewalk that runs parallel to the plank sidewalk and Las Vegas Boulevard for the length of the Treasure Island property.[3] Signs are posted at various points along the sidewalks indicating that they are the private property of the Mirage.

In October 1993, as part of the zoning, licensing, and building plans for the Mirage resort, the Mirage conveyed to Clark County a "perpetual pedestrian easement over, under, and across the parcel of land" upon which the sidewalk at issue is abutted. The legal description of the easement states that it is a "pedestrian easement for the west right-of-way of Las Vegas Boulevard."

At one time, there were publicly-owned sidewalks located along Las Vegas Boulevard; however, these public sidewalks were

---

[1]For the sake of convenience, the parties are referred to as S.O.C./Hillsboro.

[2]The Mirage and Treasure Island are both wholly-owned subsidiaries of Mirage Resorts, Incorporated. The property involved here is owned entirely by the Mirage Casino-Hotel; Treasure Island leases the land it sits upon from the Mirage Casino-Hotel.

[3]For the purpose of this appeal, the public sidewalk parallel to the plank sidewalk is not at issue. The district court's preliminary injunction specifically did not apply to the public sidewalk.

removed to accommodate the widening of the Boulevard when larger resorts were built along the Strip. The record on appeal is not clear with respect to whether the building of the Mirage and Treasure Island necessitated the widening of the Strip and the elimination of the publicly-owned sidewalks.

On April 15, 1999, the Mirage filed suit against S.O.C./Hillsboro alleging that S.O.C./Hillsboro's practice of hiring canvassers to solicit business on sidewalks in front of the Mirage properties, by passing out leaflets advertising their erotic dance services, constituted a trespass. Included in Mirage's prayer for relief were requests for preliminary and permanent injunctions. At the same time, Mirage also filed a motion for a preliminary injunction and a memorandum of points and authorities in support of its motion.

The district court held an evidentiary hearing on the motion for preliminary injunction which included the presentation of several witnesses and other documentary evidence.

The district court judge allowed the parties to submit additional briefs and took the matter under advisement. On June 30, 1999, the district court granted Mirage's request for a temporary injunction. In an oral hearing on the motion, the district court judge indicated that he did not think S.O.C./Hillsboro's arguments regarding the First Amendment were persuasive and that the Mirage was entitled to protect its private property by seeking to exclude commercial handbillers. The preliminary injunction was filed on July 8, 1999. S.O.C./Hillsboro made a timely appeal to this court on July 22, 1999.

## DISCUSSION

The decision to grant or deny a preliminary injunction is within the sound discretion of the trial court, and that discretion will not be disturbed absent abuse.[4] This court's review is limited to the record to determine whether the lower court exceeded the permissible bounds of discretion.[5] A district court's determinations of fact will not be set aside unless they are clearly erroneous.[6] If the district court's findings are supported by substantial evidence, they will be upheld.[7] Questions of law are reviewed de novo.[8]

[4]See Dangberg Holdings v. Douglas Co., 115 Nev. 129, 138, 978 P.2d 311, 319 (1999).

[5]Id.

[6]Hermann Trust v. Varco-Pruden Buildings, 106 Nev. 564, 566, 796 P.2d 590, 591-92 (1990).

[7]Nelson v. Peckham Plaza Partnerships, 110 Nev. 23, 25, 866 P.2d 1138, 1139 (1994).

[8]SIIS v. United Exposition Services Co., 109 Nev. 28, 30, 846 P.2d 294, 295 (1993).

A party seeking the issuance of a preliminary injunction bears the burden of establishing (1) a likelihood of success on the merits; and (2) a reasonable probability that the non-moving party's conduct, if allowed to continue, will cause irreparable harm for which compensatory damage is an inadequate remedy.[9]

## The easement

S.O.C./Hillsboro argue that the district court erred in granting the injunction because the Mirage sidewalks are encumbered by a perpetual easement allowing for public access. They further argue that the activities of the handbillers fall within the permissible scope of the perpetual easement.

We disagree. We conclude instead that the mere existence of the easement does not implicate the protections of the First Amendment. In addition, because of the procedural posture of the case and in light of the facts considered by the district court, we conclude that the district court did not err in finding the easement alone was insufficient to convert private property to a public forum for the purpose of entering the preliminary injunction.

In October 1993, the Mirage granted Clark County a "perpetual easement and pedestrian easement over, under, and across" the sidewalk property involved in this litigation. The easement also contained the following descriptive language: "a perpetual easement for a pedestrian and maintenance easement for streetlights, traffic control devices and for detectors over, under, and across the parcel of land."

The extent of an easement, like any other conveyance of rights in real property, is fixed by the language of the instrument granting the right.[10] Moreover, an easement must be construed strictly in accordance with its terms in an effort to give effect to the intentions of the parties.[11] Generally, easements are construed strictly in favor of the owner of the property.[12] A party is privileged to use another's land only to the extent expressly allowed by the easement.[13] As the Arizona Court of Appeals in *Dixon v. City of*

[9]*See Dangberg Holdings,* 115 Nev. at 142-43, 978 P.2d at 319; *see also* NRS 33.010.

[10]*See Cox v. Glenbrook Co.,* 78 Nev. 254, 371 P.2d 647 (1962).

[11]*See Sanders v. Lutz,* 784 P.2d 12, 14 (N.M. 1989).

[12]*See, e.g., Brown v. Eoff,* 530 P.2d 49, 52 (Or. 1975); *Gambrell v. Schriver,* 440 S.E.2d 393, 395 (S.C. Ct. App. 1994).

[13]*See Mielke v. Yellowstone Pipeline Co.,* 870 P.2d 1005, 1006 (Wash. Ct. App. 1994).

*Phoenix*[14] observed, an easement is only as broad as needed to achieve the intended result:

> The cases generally hold that an easement obtained by a governmental entity for a public use is only as broad as necessary for the accomplishment of the public purpose for which the easement was obtained and, to the extent the easement holder exceeds this right, it will be regarded as a trespasser and is responsible for damages.

Any misuse of the land or deviation from the intended use of the land is a trespass for which the owner may seek relief.[15] The Restatement addresses the privilege to enter another's property where that property contains a "public highway." The Restatement defines "public highway" to include a sidewalk laid across private property for the use of pedestrians. The Restatement suggests that where sidewalks on private property are intended to facilitate pedestrian travel, activities unrelated to travel exceed the use of such property and subject the trespasser to liability.[16]

We conclude that the easement, by its express language, is limited to pedestrian uses of the sidewalk to travel from point A to point B. The language of the easement does not contemplate use by commercial businesses seeking to advance their own economic gains. The district court did not err in making a preliminary finding that the existence of the easement alone, without more, does not transform private property into a public forum for constitutional scrutiny.

### *The requirement of a "state actor"*

S.O.C./Hillsboro concede that the Constitution does not apply to private conduct; however, they argue that the First Amendment protects the activities of its employees from infringement by the Mirage, a private entity, because the Mirage has functionally assumed the role of the government by excluding their handbillers from a traditional public venue. We cannot agree. The need to apply the "public function" exception to the application of the state action requirement of the First Amendment has not yet been demonstrated, and therefore, Mirage's exclusion of commercial handbillers does not implicate the First Amendment.

The First Amendment of the United States Constitution pro-

---

[14]845 P.2d 1107, 1114 (Ariz. Ct. App. 1992).

[15]*See* NRS 207.200; *Restatement (Second) of Torts* § 192 (1981).

[16]*Restatement (Second) of Torts* § 192 cmt. d (1981).

vides in relevant part that "Congress shall make no law . . . abridging the freedom of speech."[17] As applied to the states through the Fourteenth Amendment, it "is a guarantee only against abridgment [of the right of free speech] by government, federal or state."[18] The abridgment then must involve some form of government action. As the United States District Court for the District of Nevada explained, this requirement is subject to a limited set of exceptions:

> The general rule is that the Constitution does not apply to private conduct. See *Hudgens v. N.L.R.B.*, 424 U.S. 507, 513, 96 S.Ct. 1029, 47 L.Ed.2d 196 (1976). There are very limited exceptions to this time honored principle. One occurs in the rare instance where a private actor is performing a function that has traditionally been exclusively performed by the state. See *Flagg Bros. v. Brooks*, 436 U.S. 149, 156-59, 98 S.Ct. 1729, 56 L.Ed.2d 185. For example, in *Marsh v. Alabama*, 326 U.S. 501, 66 S.Ct. 276, 90 L.Ed. 265 (1946), a private company owned an entire town performing all of the usual municipal functions and owning all the buildings and sidewalks. Id. at 502-03, 66 S.Ct. 276. The Court found that the Constitution applied to the activity in the company owned town. Id. at 508, 66 S.Ct. 276.[19]

The "public function" doctrine created in *Marsh* is a means of satisfying the state action requirement. The doctrine provides:

> The state cannot free itself from the limitations of the Constitution in the operation of its governmental functions merely by delegating certain functions to otherwise private individuals. If private actors assume the role of the state by engaging in these governmental functions then they subject themselves to the same limitations on their freedom of action as would be imposed upon the state itself.[20] .

We conclude that S.O.C./Hillsboro rely on an unintended and overly broad reading of *Marsh v. Alabama*[21] (holding that "company town" was the equivalent of government for purposes of First Amendment).

First, *Marsh* has been consistently interpreted to apply to a very narrow set of facts where the entity in question performed

---

[17]U.S. Const. amend. I.

[18]*Hudgens v. NLRB*, 424 U.S. 507, 513 (1976).

[19]*Venetian Casino Resort v. Local Joint Executive Bd. of Las Vegas*, 45 F. Supp. 2d 1027 (D. Nev. 1999).

[20]2 R. Rotunda, J. Nowak & J. Young, *Constitutional Law* § 16.2, at 771 (1999).

[21]326 U.S. 501 (1946).

" ' 'the full spectrum of municipal powers and stood in the shoes of the State.' ' '[22]

Second, an overly broad application of the exception to the state action requirement would swallow the rule. We conclude that compelling policy reasons exist in support of a narrow reading of the ''state action'' requirement. As Professor Tribe explains:

> By exempting private action from the reach of the Constitution's prohibitions, it stops the Constitution short of preempting individual liberty—of denying to individuals the freedom to make certain choices . . . . Such freedom is basic under any conception of liberty, but it would be lost if individuals had to conform their conduct to the Constitution's demands.[23]

We hold that the district court did not err in making a preliminary finding that by owning and maintaining the particular sidewalks at issue in this case, the Mirage is not automatically performing a public function and therefore cannot be held to the Constitutional requirements of the First Amendment.

### Public forum

S.O.C./Hillsboro argue that sidewalks, no matter who maintains title, are a public forum subject to a heightened level of protection. We disagree. Privately-owned property does not lose its private nature because the public traverses upon it. In addition, inherent within our conclusion, that the district court did not err in finding that no state action has occurred, is the corollary that the forum is private.

The United States Supreme Court has formulated an approach to the protection of free speech based largely on the type of forum involved.[24] The classification of the forum identifies the applicable standard of judicial scrutiny to apply.[25] In *Perry,* the Supreme Court identified and defined three types of forums. The first is the ''quintessential public forum.''[26] A traditional public forum encompasses ''places which by long tradition or government fiat

---

[22]*Hudgens v. NLRB,* 424 U.S. 507, 519 (1976) (quoting *Lloyd Corp. v. Tanner,* 407 U.S. 551, 568-69 (1972)) (rejecting sweeping interpretation of *Marsh;* overruling *Logan Valley,* and holding that there is no First Amendment right in private shopping center); *accord Flagg Brothers, Inc. v. Brooks,* 436 U.S. 149, 159 (1978) (emphasizing the limits of the *Marsh* doctrine).

[23]L. Tribe, *American Constitutional Law* § 18-2, at 1691 (2d ed. 1988).

[24]*See Perry Educ. Ass'n v. Perry Local Educ. Ass'n,* 460 U.S. 37 (1983).

[25]*Id.* at 44.

[26]*Id.* at 45.

have been devoted to assembly and debate," such as streets and parks.[27] At the other end of the spectrum is the "nonpublic forum," which consists of public property that is neither by tradition nor designation a forum for public discourse.[28] In between these two types of forums, *Perry* further identifies "public property which the state has opened for use by the public as a place for expressive activity."[29]

S.O.C./Hillsboro cite to the often-quoted United States Supreme Court decision in *Hague v. CIO*[30] for the proposition that "[w]herever the title of streets and parks may rest, they have immemorially been held in trust for the use of the public." S.O.C./Hillsboro also cite *Frisby v. Schultz*[31] in support of their argument that sidewalks, no matter who owns them, are a "public forum." We conclude that S.O.C./Hillsboro's argument paints too broad a stroke.

The "right to exclude others" has been held to constitute a "fundamental element of private property ownership."[32] "The power to exclude has traditionally been considered one of the most treasured strands in an owner's bundle of property rights."[33]

The cases that raise this issue generally concern one of three forums: (1) privately-owned shopping malls, (2) medical clinics, and (3) privately-owned streets or walkways. We conclude that private property does not lose its private nature because it is open to the public.[34]

Especially relevant and helpful to this discussion is the Michigan Court of Appeals decision in *Commodities Export Co. v. City of Detroit*.[35] In that case, a private business enterprise attempted to distribute commercial handbills on a privately-owned bridge and surrounding property of its closest competitor.[36] The owner of the bridge attempted to exclude the handbillers who, in turn, sued alleging that they had a First Amendment right to distribute their advertisements on the property because it was held open to the general public.[37] The court of appeals, after analyzing

---

[27]*Id.*

[28]*See id.* at 46.

[29]*Id.* at 45.

[30]307 U.S. 496, 515-16 (1939).

[31]487 U.S. 474, 480 (1988).

[32]*See Armes v. Philadelphia,* 706 F. Supp. 1156, 1164 (E.D. Pa. 1989); and *Hudgens v. NLRB,* 424 U.S. 507 (1976).

[33]*Bresnick v. Beulah Park Ltd. P'ship,* 617 N.E.2d 1096, 1097 (Ohio 1993).

[34]*See PruneYard Shopping Center v. Robins,* 447 U.S. 74, 81 (1980).

[35]321 N.W.2d 842 (Mich. Ct. App. 1982).

[36]*Id.* at 844.

[37]*Id.*

the United States Supreme Court's cases in this area, concluded that the rights surrounding private property ownership cannot be extinguished because the property is held open to the public.[38] The court went on to say that ''a private property owner's rights cannot be infringed by allowing uncontested-to commercial advertising on its premises.''[39]

Other courts have also consistently ruled that private property held open to the public does not, in and of itself, create a public right to access.[40]

---

[38]*Id.* at 847.

[39]*Id.*

[40]*See Southwest Community Resources, Inc. v. Simon Property Group, LP,* 108 F. Supp. 2d 1239 (D. N.M. 2000) (mall was not public forum and mall operator was not state actor for purpose of First Amendment); *American Civil Liberties Union of Nevada v. City of Las Vegas,* 13 F. Supp. 2d 1064 (D. Nev. 1998) (mall was not public forum subject to First Amendment protections); *Garrison v. City of Lakeland,* 954 F. Supp. 246 (M.D. Fla. 1997) (paved road adjacent to hospital was private property not subject to First Amendment); *McMurdie v. Doutt,* 468 F. Supp. 766 (N.D. Ohio 1979) (''shopping center's sidewalks, streets, and parking areas, although open to the public by the private owner . . . may be subjected to nondiscriminatory bans on expression without running afoul of the First Amendment''); *Int'l Soc'y for Krishna Consciousness v. Reber,* 454 F. Supp. 1385 (C.D. Cal. 1978) (private road adjacent to theme park not public forum); *People v. Yutt,* 597 N.E.2d 208 (Ill. App. Ct. 1992) (clinic-owned sidewalks not public forum); *Planned Parenthood of Mid-Iowa v. Maki,* 478 N.W.2d 637 (Iowa 1991) (private property of reproductive health clinic not subject to First Amendment); *State v. Scholberg,* 412 N.W.2d 339 (Minn. Ct. App. 1987) (private health clinic was not public forum); *State v. Wicklund,* 589 N.W.2d 793 (Minn. 1999) (private shopping mall was not public forum); *Cincinnati v. Thompson,* 643 N.E.2d 1157 (Ohio Ct. App. 1994) (clinic property was private and therefore not subject to First Amendment constraints); *State v. Purdue,* 826 P.2d 1037 (Or. Ct. App. 1992) (private parking lot of women's clinic not functional equivalent of public property); *but see Thomason v. Jernigan,* 770 F. Supp. 1195 (E.D. Mich. 1991) (city vacated right-of-way on privately-owned sidewalk in front of health clinic was public forum); *and Citizens to End Animal Suffering v. Faneuil Hall Marketplace, Inc.,* 745 F. Supp. 65 (D. Mass. 1990) (outdoor shopping area was public forum).
S.O.C./Hillsboro also cite to the decision of the Ninth Circuit Court of Appeals in *S.O.C. v. Clark County,* 152 F.3d 1136 (9th Cir. 1998), for the proposition that the sidewalks along the Las Vegas Strip are public forums. In *S.O.C.,* the Ninth Circuit struck down C.C.C. Section 16.12, which sought to ban off-premise canvassing in the Las Vegas Resort District as being overly broad. *Id.* at 1148. S.O.C./Hillsboro argue, that ''sidewalks are a public forum if on 'private property upon which a limited easement of public access has been granted.' '' We conclude that *S.O.C.* addressed the First Amendment implications of the enforcement by C.C.C. Section 16.12 and did not address whether privately-owned sidewalks along the Strip were required to be opened as public forums for First Amendment purposes. The *S.O.C.* decision did not rest on an analysis of the complex question before this court regarding the intersection of the First Amendment and private property rights.

We conclude that the district court did not err in making a preliminary finding that the sidewalks in question are private property and therefore not subject to the reach of the First Amendment.

## *Article 1, Section 9 of the Nevada Constitution*

S.O.C./Hillsboro argue that the protections of Article 1, Section 9 of the Nevada Constitution should be interpreted more broadly than the protections of the First Amendment to the United States Constitution. They argue that a broader reading of the Nevada Constitution would afford greater protection to the type of speech activity involved in this case. S.O.C./Hillsboro invite this court to adopt the rationale of the California Supreme Court decision in *Robins v. PruneYard Shopping Center*.[41] We decline such an invitation.

In *Robins,* the California Supreme Court held that the California Constitution protected the right of individuals to solicit signatures in opposition to the United Nations resolution concerning "Zionism" in the courtyard of a privately-owned shopping center.[42] The shopping center appealed to the United States Supreme Court; and, in *PruneYard Shopping Center v. Robins,*[43] the High Court affirmed the decision, acknowledging that each state had a sovereign right to adopt its own constitution and provide its citizens more expansive individual liberties than those conferred by the Federal Constitution.[44] It is generally true that federal law, whether based on statute or constitution, establishes a minimum national standard for the exercise of individual rights and does not inhibit state governments from affording its citizens greater protections for such rights.[45]

The provision of the Nevada Constitution upon which S.O.C./Hillsboro rely is Article 1, Section 9, which provides in relevant part:

> Every citizen may freely speak, write and publish his sentiments on all subjects being responsible for the abuse of that right; and no law shall be passed to restrain or abridge the liberty of speech or of the press.

---

[41]592 P.2d 341 (Cal. 1979).

[42]*Robins,* 592 P.2d at 344.

[43]447 U.S. 74, 81 (1980).

[44]*Id.* at 81.

[45]*See Mesquite v. Aladdin's Castle, Inc.,* 455 U.S. 283, 293 (1982).

The language of this section has remained unchanged since the adoption of our first state constitution in 1864. Having reviewed the proceedings and debates of the Nevada Constitutional Convention, we conclude that there is nothing indicating that the delegates desired to enlarge the scope of the protections of the speech clause beyond those afforded by the federal counterpart.[46]

This court has never construed the state constitutional free speech provision in the context of accommodation of speech on private property. Our decisions addressing accommodation of speech on public and private property have relied equally on the First Amendment and the Nevada Constitution without distinguishing between them.[47] At least one court has observed that Nevada law differs substantially from California with regard to this issue.[48]

The majority of courts having virtually identical state constitutional language to Nevada's have interpreted the free speech provisions of their constitutions as coextensive to, but no greater than, that of the First Amendment to the United States Constitution.[49] We concur with the holding of the majority of state courts and decline to expand the scope of Nevada Constitution Article 1, Section 9.

In addition, regardless of whether the state constitution should be read more broadly or not, S.O.C./Hillsboro still must establish

---

[46]*See generally* Andrew Marsh, *Nevada Constitutional Debates and Proceedings,* Official Reporter, at 44-48 (1866).

[47]*See Culinary Workers v. Court,* 66 Nev. 166, 207 P.2d 990 (1949) (holding that picketing was protected by both the First Amendment and the Nevada Constitution); *City of Reno v. District Court,* 59 Nev. 416, 95 P.2d 994 (1939) (striking down city ordinance banning peaceful picketing as unconstitutional under the First Amendment and the Nevada Constitution); *see also Venetian,* 45 F. Supp. 2d at 1034 n.4 (recognizing plaintiff's claim that Nevada law provided no greater protection for free speech rights on private property than does the United States Constitution, but declining to rule on the basis of Nevada constitutional law).

[48]*See NLRB v. Calkins,* 187 F.3d 1080 (9th Cir. 1999) (recognizing that Nevada law does not extend special protection to free speech interests at the expense of a private store owner's property interest).

[49]*See, e.g., Fiesta Mall Venture v. Mecham Recall Comm.,* 767 P.2d 719, 723 (Ariz. Ct. App. 1988); *Citizens for Ethical Government, Inc. v. Gwinnett Place Assocs.,* 392 S.E.2d 8, 9-10 (Ga. 1990); *Illinois . v. DiGuida,* 604 N.E.2d 336 (Ill. 1992); *State v. Lacey,* 465 N.W.2d 537, 540 (Iowa 1991); *State v. Wicklund,* 589 N.W.2d 793, 799 (Minn. 1999). *But see Bock v. Westminster Mall Co.,* 819 P.2d 55 (Colo. 1991) (allowing public demonstration in private shopping mall under broad reading of state constitution); *Stranahan v. Fred Meyer, Inc.,* 958 P.2d 854 (Or. Ct. App. 1998) (adopting a more expansive reading of its state constitutional guarantees of free speech than the federal constitution).

that the Nevada Constitution restrains private conduct. We conclude, however, that nothing indicates that Article 1, Section 9 was intended to restrain private conduct. Accordingly, S.O.C./Hillsboro's position must fail.

*Preliminary injunction*

Finally, S.O.C./Hillsboro argue that the district court abused its discretion in granting the preliminary injunction because Mirage's legal argument would not have prevailed, the Mirage could not prove irreparable harm, and the loss of unfettered speech outweighs any harm suffered by the Mirage. Having concluded that the Mirage has made a prima facie case that it is entitled to exclude the commercial handbillers, we find no abuse of discretion by the district court.

This court has previously held that an injunction is an appropriate remedy for the threat of continuing trespass.[50] Accordingly, we affirm the judgment of the district court.[51]

AGOSTI and BECKER, JJ., concur.

MAUPIN, C. J., with whom SHEARING, J., agrees, concurring in the result:

I concur in the majority's result, albeit for alternate reasons.

I write separately because I believe the appellants' commercial speech invites a lowered First Amendment scrutiny, and, accordingly, the district court properly enjoined the handbillers' activities.

The basic question in this matter was convincingly settled in *Venetian Casino Resort v. Local Joint Executive Board.*[1] In *Venetian,* the defendant unions obtained a permit to picket in a private pedestrian walkway fronting the Venetian Casino Resort. That sidewalk is directly across the street from, and in every relevant respect identical to, the properties at issue in the instant matter. The federal district court concluded that the Venetian property "was previously public, serves as a thoroughfare along a main public road, and serves the needs of the general public. As such, it falls within a very limited exception to the general rule that private property is not subject to the First Amendment."[2] This exception must also apply here.

---

[50]*See Cook v. Maremont-Holland Co.,* 75 Nev. 380, 388, 344 P.2d 198, 202 (1959); *Parkinson v. Winniman,* 75 Nev. 405, 344 P.2d 677 (1959).

[51]THE HONORABLE MYRON E. LEAVITT, Justice, voluntarily recused himself from participation in the decision of this matter.

[1]45 F. Supp. 2d 1027 (D. Nev. 1999).

[2]*Id.* at 1036.

Nevertheless, the speech at issue in *Venetian* and in the case upon which *Venetian* primarily relies, *Marsh v. Alabama*,[3] is different in kind from the commercial handbilling here. Unlike union protests or religious proselytizing, commercial speech enjoys limited First Amendment protection.[4] "[T]he difference between commercial price and product advertising and ideological communication permits regulation of the former 'that the First Amendment would not tolerate with respect to the latter.' "[5]

Commercial speech may be suppressed even where, as here, it is conducted in a traditional public forum.[6] In determining whether suppression of commercial speech passes First Amendment muster, courts apply "intermediate" scrutiny, analyzing government regulations under the four-part test announced in *Central Hudson*:[7]

> At the outset, we must determine whether the expression is protected by the First Amendment. For commercial speech to come within that provision, it at least must concern lawful activity and not be misleading. Next, we ask whether the asserted governmental interest is substantial. If both inquiries yield positive answers, we must determine whether the regulation directly advances the governmental interest asserted, and whether it is not more extensive than is necessary to serve that interest.

On the record before the court, I believe that the appellants' commercial speech fails the first prong of the *Central Hudson* test. The handbills in this case advertise in-room erotic dancing with suggestive slogans. As such, they appear to solicit offers of illegal prostitution. And if they do not, they certainly create that misleading impression. Accordingly, I would hold that the appellants' commercial speech is unprotected by the First Amendment. Thus, the regulation at issue here is constitutionally permissible.

For these reasons, I concur in the court's judgment.

ROSE, J., dissenting:

The real property in question consists of two traditional sidewalks abutting Las Vegas Boulevard that are traversed daily by

---

[3]326 U.S. 501, 506 (1946).

[4]*See Central Hudson Gas & Elec. v. Public Serv. Comm'n,* 447 U.S. 557 (1980).

[5]*Metromedia Inc. v. San Diego,* 453 U.S. 490, 507 (1981) (quoting *Young v. American Mini Theatres, Inc.,* 427 U.S. 50, 69 n.32 (1976) (plurality opinion)).

[6]*See Metromedia; Cincinnati v. Discovery Network, Inc.,* 507 U.S. 410 (1993).

[7]447 U.S. at 566.

thousands who use the sidewalks as a principal thoroughfare along the city's most famous stretch of casinos, the Las Vegas Strip. By the very location and function of the sidewalks, I think it is impossible not to conclude that they serve as traditional public sidewalks. Similar thoroughfares, whether publicly or privately owned, have been recognized as public forums on which all First Amendment rights must be recognized and honored. Therefore, I disagree with the majority's conclusion that the area in question is not a public forum. But I believe that the Mirage and Treasure Island may have made a sufficient showing that the petitioner's solicitations are merely a front for prostitution, an illegal activity in Las Vegas not entitled to First Amendment protection. The district court, however, expressly declined making a finding on this issue. Therefore, although I conclude that the district court abused its discretion in granting the preliminary injunction on the ground stated, I would remand to the district court for a determination of whether the respondents are nonetheless entitled to a preliminary injunction based on the fact that the solicitations actually advertise illegal activity.

The diagram below shows the two sidewalks on which the Mirage and Treasure Island granted their "pedestrian easement" to the city.

*Diagram 1: The Easement Areas on Las Vegas Boulevard*[1]

The sidewalk in front of the Mirage is entirely owned by the Mirage and consists of a cement walkway directly abutting Las Vegas Boulevard. Part of the sidewalk is bordered by the water and volcano attraction located in front of the Mirage. The pedestrian easement includes the length of the sidewalk as it runs parallel to the Strip.

The sidewalk in front of Treasure Island consists of both a publicly owned cement walkway directly abutting Las Vegas Boulevard and an adjacent privately owned planked walkway. The pedestrian easement includes that portion of the planked walkway running parallel to Las Vegas Boulevard. The planked area serves not only as a thoroughfare along the Strip but also as a place from

---

[1]Although the diagram is a fair representation of the easement area, it is not drawn to scale and may contain minor irregularities.

which pedestrians can enjoy Treasure Island's Buccaneer Bay show, which is staged on the large pond in front of the casino. The narrow public sidewalk abutting the planked walkway is approximately five feet in width and was apparently built after Treasure Island's completion in order to relieve the pedestrian congestion caused by the performance of the Buccaneer Bay show.[2]

The majority's conclusion that the private ownership of the sidewalks allows the Mirage and Treasure Island to regulate First Amendment activities on the walkways is unpersuasive. As the United States Supreme Court has articulated: ''Ownership does not always mean absolute dominion. The more an owner, for his advantage, opens up his property for use by the public in general, the more do his rights become circumscribed by the statutory and constitutional rights of those who use it.''[3] Thus, even if the underlying land is private property, the location and purpose of the land will dictate the degree to which the owner can regulate activity on it.

The sidewalks at issue here serve as critical commercial arteries along the Las Vegas Strip and function in every other respect as traditional public sidewalks.[4] Indeed, the sidewalks serve as major ''public passageway[s]'' and ''thoroughfare[s]'' that ''facilitate the daily commerce and life of the neighborhood or city''— characteristics which the United States Supreme Court has held are indicative of traditional public sidewalks.[5] The Court further instructs that traditional public sidewalks are the ''archetype of a

---

[2]At trial, there may be evidence presented that establishes that the principal purpose of the planked area is not to serve as a public sidewalk and that adequate space is provided by the abutting public sidewalk to meet the demands of a public thoroughfare along the Strip. However, at this time, it appears that the two walkways fronting Treasure Island function coextensively as public thoroughfares except during the small portions of the day when the Buccaneer Bay show is being performed. *Cf. United States v. Kokinda,* 497 U.S. 720, 728-29 (1990) (noting that ''the location and purpose of a publicly owned sidewalk is critical to determining whether such a sidewalk constitutes a public forum'').

[3]*Marsh v. Alabama,* 326 U.S. 501, 506 (1946); *see also Hague v. CIO,* 307 U.S. 496, 515 (1939) (''Wherever the title of streets and parks may rest, they have immemorially been held in trust for the use of the public.'').

[4]As the vice president and general counsel of the Mirage testified, the sidewalks are used by: ''Guests of the Mirage and Treasure Island. People who live in Las Vegas and want to come to Treasure Island and the Mirage. People who are guests of other properties and want to go from one property to another on our side of the [Strip]. . . . Whether you were a resident, whether your were a visitor, whether you were a guest, whether you were a business person, you would move on that sidewalk.''

[5]*Kokinda,* 497 U.S. at 727-28 (emphasizing that the use of a sidewalk as a ''public passageway'' or ''thoroughfare'' to ''facilitate the daily commerce and life of the neighborhood or city'' are the characteristics of sidewalks that are traditional public forums).

traditional public forum."[6] " '[For t]ime out of mind' public streets and sidewalks have been used for public assembly and debate, the hallmarks of a traditional public forum.'"[7] Additionally, it should not be forgotten that the original purpose of the pedestrian easement was to allow the city to widen Las Vegas Boulevard into the public right-of-way typically reserved for sidewalks without depriving the public of such a sidewalk. Accordingly, because of the sidewalks' central location and important commercial function, I believe that they are public forums regardless of private ownership.[8]

Once the property is determined to be a public forum, the full panoply of First Amendment rights must be recognized and honored. Further, regulation by the government—or by a private actor who has assumed the traditional governmental function of policing the property as the Mirage and Treasure Island have done here—then becomes "sharply circumscribed."[9] Therefore, I believe that the majority is in error in concluding that the Mirage and Treasure Island can regulate speech on the easement areas by virtue of their ownership of the underlying property.[10]

Although I conclude that the sidewalks in question are public forums to which the full protections of the First Amendment apply, commercial speech promoting illegal activity enjoys no

---

[6]*Frisby v. Schultz,* 487 U.S. 474, 480 (1988).

[7]*Id.* at 480 (quoting *Hague,* 307 U.S. at 515).

[8]Indeed, it is the central location of the sidewalks and their use as commercial arteries that distinguishes them from the private walkways considered in the cases relied on by the majority. The cases cited by the majority instead deal with walkways abutting private access roads, private parking lots, or other private grounds. Unlike the sidewalks at issue here, none of the cases cited consider a walkway that abuts a city's most commercially important boulevard and that functions as a critical pedestrian thoroughfare along that boulevard.

[9]*Perry Educ. Ass'n v. Perry Local Educators' Ass'n,* 460 U.S. 37, 45 (1983); *see also Venetian Casino Resort v. Local Joint Exec. Bd. of Las Vegas,* 45 F. Supp. 2d 1027, 1035 (D. Nev. 1999) ("Thoroughfare sidewalks parallel to the main public street in a city, that allow citizens to move from one part of the city to the next, have traditionally been exclusively owned and maintained by the government. Consequently, by owning and maintaining the particular sidewalk at issue in this case, the Venetian is performing a public function.").

[10]*See Venetian,* 45 F. Supp. 2d at 1035-36 (holding that the sidewalk in front of the Venetian casino, which lies directly across from the Mirage and Treasure Island on the Strip, was a public forum subject to the full protections of the First Amendment despite the sidewalk's private ownership); *Citizens to End Animal Suffering & Exploitation, Inc. v. Faneuil Hall Marketplace, Inc.,* 745 F. Supp. 65, 70-72 (D. Mass. 1990) (holding that the lanes in the Faneuil Hall Marketplace were public forums subject to the full protections of the First Amendment despite their being leased to a private enterprise).

·

such protection.[11] Uncontradicted evidence in the record establishes that the solicitations distributed by S.O.C. and Hillsboro advertise the services of erotic performers. The advertisements often leave little doubt that physical sexual activity is part of the services offered. Additionally, Las Vegas police officers testified at the hearing below that eighty to ninety-five percent of transactions made through these solicitations involve actual sexual activity. Although some counties and cities in Nevada permit prostitution, Las Vegas does not. Therefore, because prostitution is an unlawful activity in Las Vegas, I believe that the distribution of the advertisements may not fall within the scope of First Amendment protection.

Accordingly, there exists an alternative ground on which the district court may conclude that the Mirage and Treasure Island have shown a likelihood of success on the merits and a reasonable probability of irreparable harm. Because the district court expressly declined to address this issue, however, remand for further consideration is necessary. Accordingly, I dissent from the majority and prefer instead to remand the matter to the district court for a determination of whether the advertisements in fact promote illegal activity and therefore are not entitled to First Amendment protection.

---

[11]*See Princess Sea Indus. v. State of Nev.,* 97 Nev. 534, 537, 635 P.2d 281, 283 (1981) (holding that NRS 201.440, which prohibits advertisements for prostitution in counties and cities where prostitution is illegal, does not violate the First Amendment because commercial speech for an illegal activity can be severely regulated); *see also Pittsburgh Press Co. v. Pittsburgh Commission on Human Relations,* 413 U.S. 376, 388-89 (1973) ("Any First Amendment interest which might be served by advertising an ordinary commercial proposal . . . is altogether absent when the commercial activity itself is illegal.").