329 F.3d 1044
 Joseph J. HILLS, Plaintiff-Appellant,
v.
SCOTTSDALE UNIFIED SCHOOL District, No. 48; Barbara F. Erwin, in her official capacity as Scottsdale Unified School District Superintendent; Jane McGlothlin, in her official capacity as Scottsdale Unified School District Assistant Superintendent; BObbie Sferra, in her official capacity as Scottsdale Unified School District
Assistant Superintendent; Lisa Martens, in her official capacity as District Communications Specialist, Defendants-Appellees.
 No. 01-17518.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted October 25, 2002.
 Submission Withdrawn October 31, 2002.
 Resubmitted March 6, 2003.
 Filed May 22, 2003.
 
 Walter M. Weber, American Center for Law & Justice, Alexandria, VA, for the plaintiff-appellant.
 Mary Ellen Simonson, Lewis & Roca, Phoenix, AR, for the defendants-appellees.
 C.N. Coby Cohen, Perkins Coie, Seattle, WA, for Amicus Anti-Defamation League.
 Appeal from the United States District Court for the District of Arizona; Susan R. Bolton, District Judge, Presiding. D.C. No. CV-00-01087-SRB.
 Before CANBY, HAWKINS, and BERZON, Circuit Judges.
 OPINION
 PER CURIAM.
 
 
 1
 In this case, we again confront the often confusing intersection of First Amendment rights and the delicate balance which must be struck by our public schools in insuring the right to Free Speech but avoiding endorsement of religion in violation of the Establishment Clause. Striking this balance has never been easy and this appeal demonstrates just how difficult it can be.
 
 
 2
 Joseph Hills appeals the district court's grant of summary judgment to defendant Scottsdale Unified School District (the "District"). The District permits nonprofit organizations to distribute literature through its schools, promoting events and activities of interest to students, but prohibits any flyers of a "commercial, political or religious nature." After some back and forth, the District ultimately refused to distribute Hills's brochure for a summer camp that included, among nineteen course offerings, two classes on "Bible Heroes" and "Bible Tales." Application of Supreme Court precedent requires the conclusion that the District discriminated against Hills on the basis of his religious viewpoint, and requires us to hold that the District violated Hills's First Amendment rights by denying him equal access to the District's schools.
 
 BACKGROUND
 
 3
 The District has a policy and practice of allowing certain outside groups to distribute or display brochures and other promotional literature to its students. Permitted brochures are either made available for students to pick up or placed in teachers' in-house mailboxes and then distributed by the teachers to their students. The assistant superintendent explained the purpose of permitting flyer distribution as a "community service" for parents and children, getting information to those who would be most interested in participating. Examples of acceptable flyers included those promoting summer camps, art classes, sports leagues, artistic performances or exhibits, and various YMCA, boys and girls clubs, and scouting activities.
 
 
 4
 The official policy regarding the distribution and display of promotional activities provided:
 
 
 5
 Outside agencies must receive District Approval by the Superintendent or designee prior to distribution or display of any materials.
 
 
 6
 Non-school originated material of a commercial, political or religious nature shall not be displayed at a school office. Material from community organizations or of a general nature that is not of a commercial, political or religious nature may be displayed at the school at the discretion of the principal, prior to its being displayed.[1]
 
 
 7
 (emphasis added). In addition to these limitations, in 1998 the District decided that only literature from nonprofit groups and government entities would be eligible for distribution.
 
 
 8
 Hills, an individual with experience teaching after-school programs and summer camps, decided to offer a nonprofit summer camp called the "Desert Mountain Summer Camp," run by A Little Sonshine from Arizona, an Arizona nonprofit corporation of which Hills was president. He sought to advertise the camp by distributing a multi-page brochure to nine District elementary schools.
 
 
 9
 The brochure described nineteen courses that would be offered, including classes in camping, gymnastics, golf, and elementary Spanish. There were also two classes entitled "Bible Heroes" and "Bible Tales." The course description for Bible Heroes read as follows:
 
 
 10
 Did you know ... some of the greatest people who ever lived never had a home-run record? Never flew a plane or rode a train? Never starred in a motion picture (except Moses), and still do not have a Monday holiday named after them? It's true! Come, take an adventurous ride back into time with us, and learn about some ordinary people whose faith in GOD helped them accomplish extraordinary things! Remember Noah? Just how does a man build a boat that big? And Moses ... he gives a whole new meaning to the phrase "You da Man!" We will explore Bible heroes from both the Old and New Testaments, and of course we will learn about our Greatest example JESUS. We will explore this through play acting, and puppetry, costuming, and set design, make-up and surely we will learn our lines! Come, join us in the Word, and learn what we mean by "role model."
 
 
 11
 The course description for the Bible Tales class stated:
 
 
 12
 We at Desert Mountain Summer Camp believe in a little something for everybody! That's why we have created this version of our Bible Heroes for the little Guys and Gals! Did you know that if a child does not come to the knowledge of JESUS CHRIST and learn of the importance of Bible reading by the age 12 chances are slim that they ever will in this life? We think it is important to start as young as possible! We will Sing, Act, Dance and Relive some [of] the Greatest stories ever told! And maybe ... we'll even have a surprise visit from Bob the Tomato and Larry the Cucumber, the award winning "Veggie-Tales" guys! (so much for the surprise!)
 
 
 13
 Following these course descriptions was a note which stated: "[T]hese classes are Non-denominational in nature. All Faiths are Welcome."
 
 
 14
 Hills's brochure was initially approved for distribution by district officials. Following a parental complaint, however, district officials decided to stop distributing the camp brochure. A few days later, Hills was permitted to resume distributing the brochure so long as it contained the following disclaimer:
 
 
 15
 The Scottsdale Unified School District neither endorses nor sponsors the organization or activity represented in this document. The distribution of this material is provided as a community service.[2]
 
 
 16
 The District then reversed course, telling Hills he would not be allowed to distribute the brochures even with the disclaimer. One week later, the District agreed Hills could finish distributing the brochures as long as the disclaimer was included. Another week passed and the District changed its mind again and rescinded permission, concluding it was necessary to maintain a consistent legal position in administration of the literature distribution program and to avoid a possible Establishment Clause violation.
 
 
 17
 Hills was also told that he could resubmit his brochure and that it would be acceptable if he would remove descriptions of the Bible classes, change the spelling of "Sonshine" to "Sunshine," omit graphics of the Bible, cross and dove, and incorporate the disclaimer into the brochure.[3] Hills elected not to revise his brochure and instead brought suit in district court, alleging violations of his right to Free Speech, Free Exercise of Religion, Equal Protection and Due Process. Both parties moved for summary judgment, and the district court granted summary judgment to the District on all claims. We review the district court's grant of summary judgment de novo. Everhart v. Allmerica Financial Life Ins. Co., 275 F.3d 751, 753 (9th Cir.2001), cert. denied, 536 U.S. 958, 122 S.Ct. 2662, 153 L.Ed.2d 836 (2002).
 
 DISCUSSION
 I. Free Speech
 
 18
 Hills's principal complaint is that the District's policy violates his right to Free Speech under the First Amendment. To analyze his claim, we must first consider what type of forum the District has created.
 
 A. Public v. Non-Public Forum
 
 19
 In evaluating restrictions on speech, different standards apply depending on the type of forum involved. See Perry Ed. Ass'n v. Perry Local Educators' Ass'n, 460 U.S. 37, 45-46, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983). In a traditional public forum, such as a park or sidewalk, restrictions on speech are subject to strict scrutiny and regulations must be "narrowly drawn to achieve a compelling state interest." Int'l Soc'y for Krishna Consciousness, Inc. v. Lee, 505 U.S. 672, 678, 112 S.Ct. 2701, 120 L.Ed.2d 541 (1992). When a nontraditional forum is intentionally opened for public discourse, it creates a designated public forum, see Children of the Rosary v. City of Phoenix, 154 F.3d 972, 976 (9th Cir.1998), and restrictions are analyzed with the same strict scrutiny as traditional public fora. See Perry, 460 U.S. at 46, 103 S.Ct. 948.
 
 
 20
 All remaining property is nonpublic fora. DiLoreto v. Downey Unified Sch. Dist. Bd. of Educ., 196 F.3d 958, 965 (9th Cir.1999). The government may, however, create a "limited public forum" by intentionally opening a nonpublic forum to certain groups or topics. Id. In such a case, restrictions are permissible if they are viewpoint neutral and reasonable in light of the purpose served by the forum. Id.; see also Rosenberger v. Rector & Visitors of the Univ. of Virginia, 515 U.S. 819, 829, 115 S.Ct. 2510, 132 L.Ed.2d 700 (1995).
 
 
 21
 In considering whether a designated public forum has been created, we look to "the policy and practice of the government, the nature of the property and its compatibility with expressive activity and whether the forum was designed and dedicated to expressive activities." Children of the Rosary, 154 F.3d at 976. In this case, the relevant "forum" is the District's literature distribution program, and we agree with the District that this is properly considered a limited public forum.
 
 
 22
 In DiLoreto, we determined that a high school baseball field fence opened for commercial advertising was not intended to create a forum for unlimited public expression. 196 F.3d at 966-67. We emphasized that the school district screened and rejected ads for various reasons, including their religious content or controversial nature (such as alcohol or Planned Parenthood). Id.; see also Children of the Rosary, 154 F.3d at 977-78 (practice of restricting political and religious advertising on city buses created nonpublic forum). Likewise, in this case, the District has always restricted the availability of the program, prohibiting materials that are of a "commercial, political or religious" nature. The District has always screened submissions for suitability and frequently rejected flyers for various reasons. Thus, as in DiLoreto, the District's policies and practices indicate a lack of intent to designate a forum for all expressive activity. 196 F.3d at 965-67.
 
 
 23
 Moreover, it does not appear the forum was "designed for and dedicated to expressive activities." Cornelius v. NAACP Legal Defense & Educ. Fund, 473 U.S. 788, 802-03, 105 S.Ct. 3439, 87 L.Ed.2d 567 (1985). In this case, the forum was not open to all expression or even all groups, but only to nonprofit organizations promoting activities of interest to schoolchildren that are not commercial, political or religious. The forum is therefore not open for indiscriminate use by part or all of the general public. Indeed, the nature of the property and its compatibility with expressive activity counsels against finding that the District created a designated public forum. See Hazelwood Sch. Dist. v. Kuhlmeier, 484 U.S. 260, 270-73, 108 S.Ct. 562, 98 L.Ed.2d 592 (1988) (noting unique attributes of school environment and broad purposes for which facilities may properly be reserved).
 
 
 24
 In making a forum type determination, it is important to separate the question of the propriety of the exclusion (discussed in more detail below) from the meaning of the exclusion in terms of the intent and scope of the forum. "The decision of the Government to limit access to the[forum] is not dispositive in itself; instead it is relevant for what it suggests about the Government's intent in creating the forum." Cornelius, 473 U.S. at 805, 105 S.Ct. 3439; see also DiLoreto, 196 F.3d at 967. In this case, the forum guidelines and the policies of the District suggest that it did not intend to open the school doors for indiscriminate use by all or part of the general public. Therefore, we proceed to analyze Hills's claim under the test for a limited public forum.
 
 B. Viewpoint Discrimination
 
 25
 Restrictions on speech in the context of a limited public forum must be both viewpoint neutral and reasonable in light of the purpose served by the forum. Rosenberger, 515 U.S. at 829, 115 S.Ct. 2510. As applied to Hills's brochure,[4] the District's policy violates the first requirement: The District is engaging in precisely the type of viewpoint discrimination that is forbidden under recent precedents such as Rosenberger and Good News Club v. Milford Cent. Sch., 533 U.S. 98, 121 S.Ct. 2093, 150 L.Ed.2d 151 (2001).
 
 
 26
 In Rosenberger, the University of Virginia permitted reimbursements for expenditures by student groups "related to the educational purpose" of the University, including "student news, information, opinion, entertainment, or academic communications media groups." 515 U.S. at 824, 115 S.Ct. 2510. The University, however, excluded "religious activities, philanthropic contributions and activities, political activities, activities that would jeopardize the University's tax-exempt status, those which involve payment of honoraria or similar fees, or social entertainment or related expenses." Id. at 825, 115 S.Ct. 2510. "Religious activity" was defined as any activity that "primarily promotes or manifests a particular belief in or about a deity or an ultimate reality." Id. Applying the definition, the University declined to reimburse the student publication "Wide Awake," which addressed community issues such as racism, stress and pregnancy from a Christian perspective. Id. at 825-27, 115 S.Ct. 2510.
 
 
 27
 The Supreme Court analyzed the case as involving a limited public forum, and recognized that content discrimination would be permissible if it preserved the purpose of the limited forum. Id. at 829-30, 115 S.Ct. 2510. Although the University contended it was drawing lines based on content, the Court held that "viewpoint discrimination is the proper way to interpret the University's objections to Wide Awake." Id. at 831, 115 S.Ct. 2510. The Court explained that the very terms of the guidelines did not exclude religion as subject matter, but disfavored the religious perspective, concluding that "the prohibited perspective, not the general subject matter" resulted in the disqualification for reimbursements, as "the subjects discussed were otherwise within the approved category of publications." Id.
 
 
 28
 Following Rosenberger, the Supreme Court more recently held that if a school opened its doors to groups that "promote the moral and character development of children," it could not exclude religious groups. Good News Club, 533 U.S. at 108, 112, 121 S.Ct. 2093. The Court noted that simply because something is "decidedly religious in nature" does not mean that it could not also be properly characterized as teaching morals and character from a particular perspective. Id. at 111, 121 S.Ct. 2093. The Court thus reaffirmed Rosenberger that "speech discussing otherwise permissible subjects cannot be excluded from a limited public forum on the ground that the subject is discussed from a religious viewpoint." Id. at 112, 121 S.Ct. 2093.
 
 
 29
 Following these cases, we recently held that a restriction on access to school facilities and equipment for religious clubs constituted impermissible viewpoint discrimination. Prince v. Jacoby, 303 F.3d 1074, 1091-92 (9th Cir.2002). We emphasized that the purpose of the school's forum was quite broad — it permitted access to groups that engage in "any lawful activity which promotes the academic, vocational, personal, or social/civil/cultural growth of students." Id. We therefore concluded that the school district could not then prevent the World Changers Club from teaching students "leadership and responsibility through the teaching of Jesus Christ and the Bible," as the club was essentially addressing otherwise permissible subjects from a religious standpoint. Id. at 1092.
 
 
 30
 In particular, we concluded that under the Equal Access Act, the World Changers Club must receive equal access to the school's public address and bulletin board systems in order to publicize information about its events, as long as it did not use this opportunity to "pray and proselytize." Id. at 1087. Because the neutrality and nondiscrimination policies in the Equal Access Act are largely coextensive the First Amendment requirements, id. at 1080; Bd. of Educ. of Westside Cmty. Sch. v. Mergens, 496 U.S. 226, 235, 110 S.Ct. 2356, 110 L.Ed.2d 191 (1990), that holding is pertinent in this context as well. See also Mergens, 496 U.S. at 247, 110 S.Ct. 2356 (Christian club must be given "access to the school newspaper, bulletin boards, the public address system, and the Annual Club Fair" on the same basis as other clubs).
 
 
 31
 These cases control the result here also. The District created a forum with a broad purpose. Various school officials testified in depositions that the purpose of the forum was to provide a "community service" by notifying students and their parents of extra-curricular activities or issues of general interest to students. Summer camps clearly fall within the wide range of activities "of interest to school-children" and, indeed, flyers promoting summer camps were routinely approved by the District. The District's objection, of course, was not to all of Hills's summer camp, but to the two classes which taught the Bible from a Christian perspective. The District argues that it is permitted to discriminate on the basis of subject matter, and that because it rejects all material of a "religious nature," there is no First Amendment violation here. In Rosenberger, the Supreme Court did recognize that in the context of a limited public forum, content discrimination may be permissible if it preserves the purposes of that limited forum. 515 U.S. at 830, 115 S.Ct. 2510. But the Court also stressed that viewpoint discrimination is not permissible when it is directed at speech otherwise falling within the forum's limitations. Id. at 830, 115 S.Ct. 2510.
 
 
 32
 The District argues that Rosenberger and Good News Club involved speech on "an otherwise permissible subject," such as instruction in moral and character development, whereas, in its view, Hills's classes on the Bible do not relate to "permissible subject matter," because the District's policy expressly excluded materials of a religious nature. But the terms of the District's policy cannot set this case apart from Rosenberger and Good News Club: the reimbursement policy in Rosenberger also excluded "religious activities," 515 U.S. at 825, 115 S.Ct. 2510, and the access policy in Good News Club excluded use for "religious purposes." 533 U.S. at 103, 121 S.Ct. 2093. We must instead look to the underlying purposes of the forum, and determine whether the rejected speech discussed otherwise permissible subjects from a religious viewpoint. See id. at 112, 121 S.Ct. 2093.
 
 
 33
 Moreover, the District not only concedes that summer camps are an otherwise permissible subject, but also concedes that the Bible could be a permissible subject, so long as it were taught as history or literature. This simply confirms Hills's argument that it is his particular viewpoint on the subject that caused the District to reject his brochure. The refusal to allow Hills to advertise his summer camp thus runs afoul of Supreme Court instruction: "That all religions and all uses for religious purposes are treated alike ... does not answer the critical question whether it discriminates on the basis of viewpoint to permit school property to be used for the presentation of all views ... except those dealing with the subject matter from a religious standpoint." Lamb's Chapel v. Center Moriches Union Free Sch. Dist., 508 U.S. 384, 393, 113 S.Ct. 2141, 124 L.Ed.2d 352 (1993) (holding it is viewpoint discrimination to prohibit the use of school facilities for a film on family values from a religious viewpoint). Premising refusal of permission to advertise an event or class based on the religious nature of the event or class cannot be justified under our precedents, where other similar groups can advertise events or classes similar except for their lack of religious viewpoint.
 
 
 34
 Good News Club teaches that speech discussing otherwise permissible subjects cannot be excluded from a limited public forum simply because the subject is discussed from a religious viewpoint. 533 U.S. at 112, 121 S.Ct. 2093. The District's exclusion of Hills's summer camp brochure because it offered Bible classes from a Christian perspective does just that, and therefore constitutes impermissible viewpoint discrimination.
 
 
 35
 If an organization proposes to advertise an otherwise permissible type of extra-curricular event, it must be allowed to do so, even if the event is obviously cast from a particular religious viewpoint (so long as all such viewpoints are treated even-handedly). Prince so indicated by requiring the school district in that case to permit announcement of the World Changers Club meetings during school time, using school facilities. 303 F.3d at 1094. Thus, for example, we believe the District's policy could validly exclude a "religious tract" aimed at converting students to a particular belief, because the school's forum was never opened for pure discourse. We doubt, however, that the policy could exclude advertisements of a local Passover Seder or a Christmas performance of Handel's Messiah, as these are extra-curricular activities that would no doubt be "of interest" to many schoolchildren.
 
 
 36
 We do not, however, mean to suggest that the District must distribute Hills's brochure as it was originally proposed.[5] The District believed that all of the Bible course descriptions had to be excised, along with any religious symbols, because these indicated that the Bible would be taught from a Christian viewpoint. As discussed above, this premise constitutes viewpoint discrimination. However, because the District has created only a limited public forum, it could still exercise some control over the content of Hills's brochure, to the extent that some of the language in the proposed brochure exceeds the scope of the District's forum.
 
 
 37
 For example, Hills's brochure contained the language "Did you know that if a child does not come to the knowledge of JESUS CHRIST, and learn the importance of Bible reading by age 12, chances are slim that they ever will in this life? We think it is important to start as young as possible!" This language was promotional not only of the class but of religion, and went beyond a description of the organization's general religious mission to directly exhort the reader to involve children in religious observance. We stated in Prince that the World Changers Club could announce its meetings using the school's facilities but could not in so doing "pray and proselytize." 303 F.3d at 1087. Likewise, the District is not obligated to distribute material that, in the guise of announcing an event, contains direct exhortations to religious observance; this exceeds the purpose of the forum the District created.[6] Exclusion of such material would not be based on viewpoint, but on subject matter. In other words, the District cannot refuse to distribute literature advertising a program with underlying religious content where it distributes quite similar literature for secular summer camps, but it can refuse to distribute literature that itself contains proselytizing language. The difference is subtle, but important.
 
 
 38
 Because the District took the position that Hills had to delete the Bible course descriptions in their entirety (and that even that might not be enough), we are not called upon in this case to parse each individual line in Hills's brochure. We thus hold only that if the District permits the distribution of similar secular programs by other non-profit organizations, then the District cannot refuse to distribute literature advertising an off-campus summer program because it is taught from a Christian perspective.
 
 C. Establishment Clause Defense
 
 39
 The District argues its policy is not only permissible, but actually required in order to comply with the Establishment Clause. We have recognized that Establishment Clause concerns can justify speech restrictions "in order to avoid the appearance of government sponsorship of religion." Lassonde v. Pleasanton Unified Sch. Dist., 320 F.3d 979, 983-85 (9th Cir.2003); see also Cole v. Oroville Union High Sch. Dist., 228 F.3d 1092, 1103-05 (9th Cir.2000); Prince, 303 F.3d at 1082.[7] The District has not, however, demonstrated that the Establishment Clause would be violated if it permitted distribution of literature that advertised religious programs or events.
 
 
 40
 The District first argues that the impressionability of elementary-age students mandates exclusion of such material. Although some cases have recognized the particular impressionability of young students, this factor is far from dispositive. In Good News Club, the Court dismissed the argument that young children would feel coercive pressure to participate in the religious club or feel that the school was somehow endorsing it. 533 U.S. at 113-15, 121 S.Ct. 2093; see also id. at 119, 121 S.Ct. 2093 ("We decline to employ Establishment Clause jurisprudence using a modified heckler's veto, in which a group's religious activity can be proscribed on the basis of what the youngest members of the audience might misperceive.") The Court noted that parents would choose the activities their children would attend and that there would be no reasonable likelihood the parents would believe the school was endorsing religion. Id. at 115, 121 S.Ct. 2093. Similarly, in this case, the brochures are sent home with students so that their parents can select extra-curricular activities for their children. Indeed, there is even less danger of a perception of "endorsement" for materials containing an express disclaimer that the school does not endorse or sponsor the organization promoting the activity. See Prince, 303 F.3d at 1094 (noting that district can dispel any "mistaken inference of endorsement" by making it clear to students that private speech is not the speech of the school).[8]
 
 
 41
 Good News Club also stressed that the after-school religious instruction was conducted by individuals who were not schoolteachers and only to those children who received parental consent. 533 U.S. at 117-18, 121 S.Ct. 2093. Again, there is even less danger of the perception of endorsement in this case because the promoted activity would not even take place on school property, much less during school hours. Although the District voices concern because the flyers are sometimes handed out to students at the end of the day — thus technically "during school hours" — they are certainly not part of the teacher's instruction or curriculum. Moreover, recent decisions have placed no emphasis on whether access occurs during school hours. See Prince, 303 F.3d at 1077; see id. at 1094-97 (Hall, concurring) (responding to dissent's argument that equal treatment during school hours would violate Establishment Clause). Indeed, the Supreme Court counseled in Good News Club that "the school could not deny equal access ... for any time that is generally available for public use." 533 U.S. at 114 n. 5, 121 S.Ct. 2093.
 
 
 42
 The District also argues that the Establishment Clause could be violated because in some schools the teachers hand the flyers directly to the students. In Culbertson v. Oakridge School District, 258 F.3d 1061, 1065 (9th Cir.2001), we recognized that the local Good News Club should be afforded equal access to the school building, but modified an injunction requiring the district to treat the club's permission slips in the same way as other non-school groups — having teachers hand permission slips directly to students. In Culbertson, we explained that requiring teachers to distribute permission slips "puts the teachers at the service of the club" and overstepped the line between neutrality and endorsement. Id. Culbertson, however, is distinguishable in a variety of ways, because in this case the underlying activity is not occurring on school grounds, the school is not handling the permission process, and the brochure contained an express disclaimer that the activity was not endorsed by the school. Moreover, in Culbertson, both brochures about the club and parental permission slips were distributed by teachers, but the opinion only modified the injunction with respect to the permission slips. Id. at 1064-65. Thus, nothing in Culbertson suggests that handing students brochures about an off-campus activity violates the Establishment Clause.[9]
 
 
 43
 The Seventh Circuit reached a similar result in an Establishment Clause challenge to a school's literature distribution program which permitted the Boy Scouts of America, as well as numerous secular organizations, to distribute brochures and put up posters at the school. Sherman v. Cmty. Consol. Sch. Dist. 21 of Wheeling Township, 8 F.3d 1160 (7th Cir.1993). Similar to the District's forum, the program permitted distribution or display of materials if coming from a non-profit organization that provided a community service or offered youth-oriented activities. Id. at 1163. Sherman concluded that the minimal involvement of teachers in distributing Boy Scout brochures during school hours or the placement of Boy Scout posters throughout the school did not create an Establishment Clause violation in light of the many factors which mitigated Establishment Clause concerns. Id. at 1166. For example, as in this case, flyers from numerous organizations were distributed simultaneously, the information in the flyers was not discussed or incorporated into the curriculum, and the school did not draw special attention to any particular group or assume responsibility for the content of group handouts or meetings. Id.
 
 
 44
 We are mindful that school districts today confront many difficult choices when navigating the sometimes fine line between permitting free speech and avoiding the pitfalls of the Establishment Clause. Schools, however, "do not endorse everything they fail to censor." Mergens, 496 U.S. 226, 250, 110 S.Ct. 2356, 110 L.Ed.2d 191 (1990) (plurality). Although it is desirable to avoid the perception of endorsement of religion, "there are countervailing constitutional concerns related to rights of other individuals in the community," Good News Club, 533 U.S. at 119, 121 S.Ct. 2093, which cannot be ignored. We agree with the Seventh Circuit that the desirable approach is not for schools to throw up their hands because of the possible misconceptions about endorsement of religion, but that instead it is
 
 
 45
 [f]ar better to teach [students] about the first amendment, about the difference between private and public action, about why we tolerate divergent views.... The school's proper response is to educate the audience rather than squelch the speaker. Schools may explain that they do not endorse speech by permitting it. If pupils do not comprehend so simple a lesson, then one wonders whether the [ ] schools can teach anything at all. Free speech, free exercise, and the ban on establishment are quite compatible when the government remains neutral and educates the public about the reasons.
 
 
 46
 Hedges v. Wauconda Cmty. Unit Sch. Dist. No. 118, 9 F.3d 1295, 1299-1300 (7th Cir.1993).
 
 
 47
 In sum, neither the age of the schoolchildren nor the time and manner of flyer distribution requires the District to exclude the brochure or run afoul of the Establishment Clause. Similar Establishment Clause defenses have been raised and rejected by the Supreme Court in recent equal access cases. See Good News Club, 533 U.S. at 113, 121 S.Ct. 2093 (noting the Court had rejected similar defenses in other Free Speech cases such as Lamb's Chapel and Widmar v. Vincent, 454 U.S. 263, 102 S.Ct. 269, 70 L.Ed.2d 440 (1981)). The perception of endorsement of religion is even less likely in this case, because of the express disclaimers that the activity is not school-sponsored and because the activity would not even occur on school grounds.
 
 
 48
 When the District denied Hills access to the school's limited public forum, it discriminated against him because of religious viewpoint in violation of the Free Speech Clause of the First Amendment. Because the District has not raised a valid Establishment Clause claim, we do not address the question whether such a claim could excuse the District's viewpoint discrimination.[10]
 
 II. Vagueness
 
 49
 Hills also contends that the District's policy is not only unconstitutional as applied, but that it is unconstitutionally vague because it gives government officials "unbridled discretion" to determine what is or is not forbidden "religious" speech. A policy can be unconstitutionally vague if the standard (or lack thereof) creates the danger of viewpoint discrimination; this is true even if there is no sanction or penalty imposed on the speaker. See Children of the Rosary, 154 F.3d at 983; see also Forsyth County Georgia v. Nationalist Movement, 505 U.S. 123, 133-34, 112 S.Ct. 2395, 120 L.Ed.2d 101 (1992) (invalidating wholly discretionary fee and permit process).
 
 
 50
 The District's policy is not vague because the regulations are sufficiently clear that persons of ordinary intelligence can determine what is prohibited. See California Teachers Ass'n v. State Bd. of Educ., 271 F.3d 1141, 1152 (9th Cir.2001) (finding statute using "words of common understanding" not unconstitutionally vague). Although District officials did vary somewhat in their deposition testimony as to what would be excluded under the policy, that there may be some "close cases" or difficult decisions does not render a policy unconstitutionally vague. See id. (uncertainty at the margins will not warrant facial invalidation if it is clear what the statute proscribes in majority of its intended applications). Although not perfectly clear, the term "religious" is a common term and does at least provide some degree of constraint on the District. See Grayned v. City of Rockford, 408 U.S. 104, 110, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972) ("Condemned to the use of words, we can never expect mathematical certainty from our language."). We cannot say that the District's policy is facially void for vagueness. As discussed above, however, the policy still must be applied in a viewpoint neutral manner.
 
 CONCLUSION
 
 51
 Because the District has violated Hills's rights under the Free Speech Clause of the First Amendment, the judgment of the district court is REVERSED and this case is REMANDED for proceedings consistent with this opinion.
 
 
 
 Notes:
 
 
 [1]
 Although the second paragraph refers only to materials being "displayed," the parties agree that the same policy was applied to materials that were to be distributed within the schools
 
 
 [2]
 All flyers are now required to contain this disclaimer
 
 
 [3]
 At argument, the District asserted that it might have excluded the brochure even if it simply said "Bible Study," if the class was not being taught as a "historical, academic subject."
 
 
 [4]
 We focus on Hills's "as applied" challenge to the District policy, as we have previously rejected the argument that excluding religion as a subject or category from a limited public forum always constitutes viewpoint discriminationDiLoreto, 196 F.3d at 969.
 
 
 [5]
 Indeed, Hills does not specifically seek such a remedy
 
 
 [6]
 This particular language might also present Establishment Clause concerns; however, because we do not need to address the specific content of Hills's brochure to determine that viewpoint discrimination occurred, we do not reach this question
 
 
 [7]
 The Supreme Court observes inGood News Club that the question "whether a State's interest in avoiding an Establishment Clause violation would justify viewpoint discrimination" is an open one. 533 U.S. at 113, 121 S.Ct. 2093. The cases cited in the text, however, indicate the question is not open in this court, as we have upheld exclusions of religious speech in public fora. See Cole, 228 F.3d at 1101 (assuming without deciding that graduation ceremony was a public forum). To be sure, the question whether a forum is public significantly overlaps with the question whether the speech bears the imprimatur of the government such that Establishment Clause concerns are sufficiently implicated to justify viewpoint discrimination. Cole and Lassonde establish, however, that the questions are not identical.
 
 
 [8]
 We recently held inLassonde that a disclaimer was not sufficient to alleviate Establishment Clause concerns in the graduation speech context. 320 F.3d 979, 984 (9th Cir.2003). Lassonde, however, involved a decidedly different context — participation in a graduation exercise — in which the possibility that the speech bears the imprimatur of the school is heightened. See, e.g., Lee v. Weisman, 505 U.S. 577, 592, 112 S.Ct. 2649, 120 L.Ed.2d 467 (1992); see also Good News Club, 533 U.S. at 115-16, 121 S.Ct. 2093 (distinguishing Lee).
 
 
 [9]
 Even ifCulbertson indicates that it would be problematic for the teachers to hand the brochures directly to students, it does not stand for the proposition that it is an Establishment Clause violation for the brochures to be generally available to students in some other manner.
 
 
 [10]
 Because we hold that Hills is entitled to relief on his claim under the Free Speech Clause, we do not address his additional arguments that the District also violated his rights under the Free Exercise Clause, the Establishment Clause and the Equal Protection Clause. Hills's argument that the district court abused its discretion by denying his motion to supplement the record is dismissed as moot