*716
 
 OPINION
 

 Per Curiam:
 

 In this appeal, we examine the constitutional and statutory boundaries of the government’s right to impose “time, place, and manner” restrictions on the use of its property for petition-circulating activities. The First Amendment to the United States Constitution and Article 1, Section 9 of the Nevada Constitution protect the rights of persons to engage in expressive speech activity. Similarly, Article 19 of the Nevada Constitution expresses the popular right to circulate referendum and initiative petitions in Nevada. Finally, NRS 293.127565 governs the right to use public buildings to collect petition signatures.
 

 The district court determined that actions taken by certain governmental actors, including appellants, to restrict respondent’s petition-circulating activities on their respective properties unlawfully violated respondent’s constitutional and statutory rights. Further, it determined that if appellants’ actions were allowed to
 
 *717
 
 continue, respondent’s signature-gathering abilities would be irreparably harmed. Accordingly, the district court issued a preliminary injunction, enjoining appellants from further interfering with respondent’s exercise of its rights. This appeal followed.
 

 We conclude that the district court erred in determining that appellants’ time, place, and manner restrictions unconstitutionally violated respondent’s right to gather signatures. Further, we conclude that the district court erred, with respect to appellant University and Community College System of Nevada, in determining that NRS 293.127565 applied to prohibit enforcement of the University of Nevada, Las Vegas expressive-activities policy. Finally, we agree with the district court’s conclusion that some provisions within appellant Regional Transportation Commission’s guidelines constitute impermissible restrictions under NRS 293.127565.
 

 FACTS
 

 In Nevada, petition circulators have a limited amount of time within which to collect signatures on proposed ballot measures and to transmit their signed petition documents to the county clerks for signature verification, who must then submit verified petitions to the Secretary of State for ballot placement within constitutional time frames.
 
 [2]
 
 From late-2003 to mid-2004, respondent Nevadans for Sound Government’s (NSG) petition circulators gathered signatures on two petitions containing measures to be placed on the November 2004 ballot: a referendum petition, with an initial submission deadline of May 18, 2004, and an initiative petition, with an initial submission deadline of June 15, 2004. On May 28, 2004, NSG filed an amended complaint in the district court, alleging that various actions taken during the previous months by Nevada’s Department of Motor Vehicles (DMV), and appellants Regional Transportation Commission of Washoe County (RTC) and University and Community College System of Nevada (UCCSN), had unlawfully restricted its access to DMV, RTC, and UCCSN properties for signature collecting purposes. As the DMV has not appealed, only the RTC and UCCSN actions are at issue.
 

 
 *718
 

 RTC property
 

 RTC guidelines essentially restrict the use of designated areas to persons who are gathering signatures for petitions governed by NRS Chapter 293, including initiative, referendum, and recall of public officer petitions. The guidelines establish that, when possible, the designated area will “be such that . . . [patrons] may use another path that does not go by signature gatherers or may pass them at a reasonable distance.” However, the precise locations of the designated areas are not indicated in the guidelines. The guidelines further provide that an RTC request form must be submitted three business days before the date of the intended activity. The request form asks for the name, telephone number, and organization of the requestor. It also asks for the subject of the petition, and whether it is for city, county, or state elections. Finally, it asks the requestor for the dates on which the activity is to occur. There is a space for the requestor to sign the form, thereby agreeing to comply with RTC guidelines.
 

 Under the guidelines, only petition circulators gathering signatures on petitions for city, county, or state-wide elections who have given “adequate notice in accordance with [RTC] guidelines shall be permitted to conduct the signature gathering activity.” The guidelines state that the “RTC will contact [the requestor] no later than two business days after receiving [the] request to confirm that [the requested] activity qualifies under the provisions of NRS 293.127565 ,”
 
 [3]
 
 Additionally, the guidelines provide that failure to comply with their restrictions will result in the immediate revocation of any permission to use RTC facilities for signature gathering.
 

 On May 6, 2004, one of NSG’s directors called the RTC to discuss alleged problems that NSG members had encountered when they attempted to access RTC’s CitiCenter hub in Reno to gather signatures. She was directed to RTC chief legal counsel Stan Peck, on whose voicemail she left a message. When Peck returned her call, she asserted that she was thereby notifying him of NSG’s intent to petition on RTC premises anytime between then and June 15. Although the NSG director noted her disagreement with Peck’s response that she would first have to fill out some paperwork, Peck nevertheless faxed her copies of the RTC guidelines and request form.
 

 According to the NSG director, she and her companions arrived that same day (May 6), began to gather signatures, and were told by RTC employees that they had to sign the request form or cease gathering signatures. They refused to sign or leave, and were eventually arrested by Reno police officers. The director testified that,
 
 *719
 
 on May 6, no one ever told her where RTC’s designated signature-gathering area was located.
 

 UCCSN property
 

 The University of Nevada, Las Vegas (UNLV) deems its campus and facilities a “non-public forum,” except for certain areas expressly listed, which are open to the public for First Amendment activities. The designated areas include the academic malls and alumni walk, and are designed to reach approximately seventy-five percent of the students, faculty, and staff on campus on any given day. The policy requires “notification to the University Public Affairs Office” by anyone intending to use the premises for expressive activities.
 

 UNLV also has a form seeking the requestor’s name and contact information, which the requestor must sign. UNLV does not have a set policy regarding how much advance notice must be given and does not attempt to verify the type of petition being circulated. Further, although UNLV does not require written acceptance of its guidelines, it expects visitors to follow those guidelines.
 

 The evidence presented to the district court concerning UCCSN revolved primarily around an incident outside of UNLV’s Artemis W. Ham Concert Hall (Ham Hall) on May 18, 2004. That night, the Bush Campaign held what UCCSN asserts was a private, ticketed, invited-guests-only political rally at the hall. The campaign arranged and paid for additional security directly with the UNLV police department.
 

 An NSG petition circulator testified that he arrived without prior notice on the UNLV campus around 3:30 or 4:00 p.m. to collect signatures outside Ham Hall. He stated that he approached the “most authoritative” person he saw, a UNLV police officer, who directed him to the other (north) side of the building. The petition circulator testified that he was standing at the bottom of the northern stairwell, soliciting signatures, when another UNLV police officer told him that he had to leave because petitioning is not allowed on UNLV property According to the circulator, he and the officer had further discourse regarding his signature-gathering activities, during which the officer blocked his access to exiting persons and insisted that he move to the side, away from the stairwell. The officer, according to the circulator, then handcuffed him and led him away from the exit path. The circulator refused to leave the area and was consequently arrested. He testified that the only other signature-gathering location offered to him was away from the exits, off UNLV property.
 

 Following the June hearing, the district court determined that NSG’s signature-gathering efforts had been hindered in violation of constitutional and statutory rights and, accordingly, issued an order
 
 *720
 
 granting a preliminary injunction. Specifically, the district court noted the above incidents, made findings as to similar events at DMV locations, and stated that “[t]he record is replete with testimony of instances where the [government actors] forced [NSG] group members and agents to leave state public buildings for lack of official authorization to be circulating petitions on the premises, and instances of denial of [NSG’s] asserted right to use the building[s].” The court rejected appellants’ arguments that their actions were taken pursuant to permissible time, place, and manner restrictions, and enjoined them from further acting to prevent NSG from the full enjoyment of its rights. In addition, the district court’s order directed the county clerks to accept the two petitions for filing through the “close of business July 20, 2004,” and the Secretary of State to expedite his respective ballot duties by advancing formation of a pro/con committee. UCCSN and RTC appeal from the preliminary injunction prohibiting them from enforcing their expressive-activity policies.
 

 DISCUSSION
 

 Mootness
 

 Initially, we note that NSG’s signature-gathering activities for the November 2004 ballot have concluded. Normally, a controversy must be live through all stages of the proceeding.
 
 [4]
 
 “[T]he duty of every judicial tribunal is to decide actual controversies by a judgment which can be carried into effect, and not to give opinions upon moot questions or abstract propositions, or to declare principles of law which cannot affect the matter in issue before it.”
 
 [5]
 
 Thus, this court has long recognized that cases presenting live controversies at the time of their inception may become moot by the occurrence of subsequent events.
 
 [6]
 
 In the present matter, when NSG submitted its initiative petition and referendum to the county clerks, it arguably rendered the appeal moot.
 

 Even when an appeal is moot, however, this court may consider it when the matter is capable of repetition, yet evading review.
 
 [7]
 
 This exception applies to the present controversy.
 

 
 *721
 
 Since Nevada’s Legislature convenes biennially, persons soliciting signatures for an initiative or referendum have a relatively short time in which to gather signatures. Further, determining whether time, place, and manner restrictions on signature gathering were reasonable necessarily requires an intensive factual inquiry into the particular facts of each case. Therefore, a party seeking redress must bring his or her complaint to the district court in the first instance.
 
 [8]
 
 It is highly likely that this issue will be raised again in the future, yet evade review. Accordingly, we conclude that the repetition exception applies and, although the time for gathering signatures has ended, we will consider this appeal.
 

 The injunction
 

 Determining whether to grant or deny a preliminary injunction is within the district court’s sound discretion.
 
 [9]
 
 Review on appeal is limited to the record, and the district court’s decision will not be disturbed absent an abuse of discretion or unless it is based on an erroneous legal standard.
 
 [10]
 
 Factual determinations will be set aside only when clearly erroneous or not supported by substantial evidence, but questions of law are reviewed de novo.
 
 [11]
 

 NRS 33.010(1) authorizes an injunction when it appears from the complaint that the plaintiff is entitled to the relief requested and at least part of the relief consists of restraining the challenged act. Before a preliminary injunction will issue, the applicant must show “(1) a likelihood of success on the merits; and (2) a reasonable probability that the non-moving party’s conduct, if allowed to continue, will cause irreparable harm for which compensatory damage is an inadequate remedy.”
 
 [12]
 
 In considering preliminary injunctions, courts also weigh the potential hardships to the relative parties and others, and the public interest.
 
 [13]
 

 
 *722
 
 Appellants argue that the district court committed several legal errors in determining that their actions, allegedly taken pursuant to internal time, place, and manner restrictions, violated NSG’s constitutional and statutory rights. In particular, appellants assert that the district court improperly failed to consider the character of the forum in which NSG was attempting to collect signatures, and erroneously interpreted NRS 293.127565 as limiting their ability to impose reasonable restrictions regarding signature gathering on their premises. Finally, to the extent that it was used to grant NSG injunctive relief, appellants challenge the district court’s underlying authority to postpone the date by which NSG’s petitions had to be filed. Because this decision addresses the substance of RTC’s and UCCSN’s appellate concerns, we do not reach appellants’ additional arguments regarding the time extension.
 

 I. Constitutional challenge
 

 Freedom of speech
 

 The First Amendment to the United States Constitution, as applied to state governments through the Fourteenth Amendment,
 
 [14]
 
 prohibits a state from “abridging the freedom of speech.”
 
 [15]
 
 Similarly, Article 1, Section 9 of the Nevada Constitution protects the general right of the people to engage in expressive activities in this state. We have held that Article 1, Section 9 affords no greater protection to speech activity than does the First Amendment to the United States Constitution.
 
 [16]
 
 Further, while Article 19 of the Nevada Constitution expressly recognizes the right to engage in a specific type of expressive activity, including the right to circulate referendums and petitions, that provision likewise grants no broader protection than the First Amendment and Article 1, Section 9 of the Nevada Constitution grant to any covered expressive activity. Therefore, under the Nevada Constitution, the appropriate analysis of appellants’ restrictions is identical to that under the First Amendment.
 
 [17]
 

 As pointed out by the district court, the circulation of ballot petitions constitutes “core political speech”
 
 [18]
 
 for which First Amendment protection is “at its zenith.”
 
 [19]
 
 Nevertheless, the First
 
 *723
 
 Amendment does not grant a circulator the right to access all “[government property without regard to the nature of the property or to the disruption that might be caused.”
 
 [20]
 

 Time, place, and manner restrictions under the First Amendment
 

 When analyzing the constitutionality of restrictions placed on protected speech activities that take place on government property, the United States Supreme Court has differentiated between public and nonpublic forums.
 
 [21]
 
 Public forums encompass “‘places which by long tradition or government fiat have been devoted to assembly and debate,’ such as streets and parks.”
 
 [22]
 
 Public forums may also be created by government designation.
 
 [23]
 
 However, when the government designates a forum as public, it must intend to open the forum for use by all or part of the public for discourse.
 
 [24]
 
 Mere permission to freely go onto government land is not enough to create a designated public forum.
 
 [25]
 
 Thus, the government does not create a designated public forum by “‘“permitting limited discourse.”’”
 
 [26]
 
 Speech in a public forum may be regulated by content-neutral “time, place, and manner” restrictions that are “narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication.”
 
 [27]
 

 “All remaining property is nonpublic fora.”
 
 [28]
 
 Within the nonpublic forum description, at least for standard of review purposes, falls a subset, the “ ‘limited public forum.’ ”
 
 [29]
 
 A limited public
 
 *724
 
 forum is created when a state designates an area for speech activities by certain groups or for certain subjects.
 
 [30]
 
 In limited public forums, the state “must respect the lawful boundaries it has itself set.”
 
 [31]
 
 When either nonpublic or limited public forums are involved, government restrictions on time, place, and manner will be upheld if they are viewpoint neutral and related to a legitimate government “purpose served by the forum.”
 
 [32]
 
 Moreover, “[t]he government’s decision to restrict access to a nonpublic forum need only be reasonable; it need not be the most reasonable or the only reasonable limitation.”
 
 [33]
 

 In determining whether a forum is public or nonpublic, courts consider the “policy and practice of the government” and the “nature of the property and its compatibility with expressive activity.”
 
 [34]
 
 Thus, when expressive activity would disrupt the principal function of the property — for instance, when the property is being used as a commercial enterprise — the United States Supreme Court has been reluctant to find that the government intended to designate the forum public.
 
 [35]
 
 Finally, the property should not be identified on its own basis, but rather, in light of the access sought.
 
 [36]
 

 Forum characterization
 

 In order to properly analyze the validity of appellants’ actions, we must first determine the character of the RTC and UCCSN areas to which NSG petition circulators sought access.
 
 [37]
 

 
 *725
 
 In contending that the RTC CitiCenter is a limited public forum, RTC asserts that its primary purpose is to allow the transfer of passengers between buses, not to provide a forum for the free exchange of ideas.
 
 [38]
 
 RTC notes that before the 2001 enactment of NRS 293.127565, which mandates that petition circulators be permitted to gather signatures at government-occupied buildings that are open to the general public,
 
 [39]
 
 its policy prohibited all solicitation activities. RTC concedes that, under the statute, it was required to open its facilities to petition circulators for signature-gathering activities. However, according to RTC, neither the statute nor RTC guidelines compel it to grant access for expressive activity to the public at large. Therefore, RTC asserts that with the enactment of NRS 293.127565, the state purposefully created a limited public forum at certain public buildings, including the RTC CitiCenter. We agree.
 

 Clearly, the RTC CitiCenter was not “designed [for] and dedicated to” the advancement of expressive activities.
 
 [40]
 
 Although NRS 293.127565 creates an obligation for the CitiCenter to provide areas for signature gathering, the statute applies only to people gathering signatures for petitions; it does not grant rights to the general public to engage in any type of speech activity that would normally be permitted in a traditional public forum. Nor does RTC permit speech activities on its premises other than those mandated by the statute. Further, the CitiCenter is of limited space and its patrons have limited time in which to make connections.
 
 [41]
 
 If unrestricted expressive activity were allowed, the principal operations of the transportation system could be severely disrupted. Accordingly, we conclude that the RTC CitiCenter is a limited public forum, and RTC policies should be reviewed under the reasonableness standard generally applied to time, place, and manner restrictions of limited public and nonpublic forums.
 

 As for UCCSN, it asserts that UNLV’s campus is a “nonpublic forum [for which it] has established designated areas for ex
 
 *726
 
 pressive activities” by the public.
 
 [42]
 
 Typically, when reviewing restrictions placed on students’ speech activities, courts have found university campuses to be designated public forums.
 
 [43]
 
 However, when the rights being restricted belong to nonstudents, courts have generally held university facilities and campuses to be limited public or nonpublic forums.
 
 [44]
 

 Recently, the Ohio Court of Appeals addressed the issue of designated areas for speech on college campuses. In
 
 State v. Spingola,
 

 [45]
 

 Ohio University’s regulations permitted the use of six designated areas for speech activities by anyone who applied for and received a permit. The court determined that the specifically designated areas were public forums, while the remainder of the campus was a nonpublic forum.
 
 [46]
 

 Similarly, UNLV’s policies designate certain areas for speech activity by the general public. The policies state that the rest of UNLV’s property is a nonpublic forum “for purposes of expressive conduct.” While a policy’s language should not be the only factor in determining which type of forum analysis applies, UNLV’s practice appears consistent with this designation and decisional law. Further, NSG has not demonstrated that its petition circulator was
 
 *727
 
 a UNLV student, or that he was attempting to gather signatures in an area on UNLV’s designated areas list. Accordingly, we conclude that UNLV is a limited public forum and, in this instance, that its policies regarding expressive activity in nondesignated areas of its campus are subject to the same reasonableness review as those pertaining to the RTC CitiCenter.
 

 Restrictions ’ reasonableness
 

 At issue in this appeal are the RTC and UNLV policies concerning advance notice, identification of the petition’s subject and the petition circulator, pre-authorization, physical placement of designated signature-gathering area, and the requirement that a petition circulator agree, in writing, to abide by certain guidelines. Neither written policy discriminates amongst signature gatherers based on the content of the petition or the viewpoint of the petition circulator. Therefore, we must decide whether the policies are reasonable in light of the RTC CitiCenter’s transportation purposes and UNLV’s educational purposes'.
 
 [47]
 

 RTC contends that its guidelines were created in order to accommodate petition circulators while also ensuring the safety and security of RTC patrons and preserving efficient operations of its transportation system. It asserts that its policy was implemented to deal with several concerns. For instance, RTC asserts that requiring advance notice, specification of the requested information, and petition circulators’ agreement to abide by the guidelines allow it to (1) verify that the petition is an authentic NRS Chapter 293 ballot measure, since no other expressive activity is permitted at RTC locations; (2) timely procure any additional security it feels might be necessary to curb potential disturbances arising from the contents of the petition; (3) prevent confusion and unnecessary confrontations with signature gatherers; (4) provide any additional employees, supervisors, signage, etc., that might be needed to direct patrons; and (5) coordinate areas with other groups. In addition, with respect to its designated-area provision, RTC asserts that its CitiCenter is a “cramped” area in which patrons are often pressed up to the curb edges, and through which patrons have to quickly cross in order to make connections, and notes the potential dangers of permitting groups of signature gatherers or their equipment to become obstacles to unwary or distracted patrons.
 

 
 *728
 
 UNLV similarly requires advance notice, although of an undetermined period, and that requestors fill out and sign a form with their names and contact information, indicating the type of activity involved. UNLV asserts that it asks for notice and the above information in order to (1) know who to contact if a problem arises, (2) confirm that the use is noncommercial, (3) “keep track of who is on campus for a legitimate purpose,” (4) make any arrangements for unusual events, and (5) explain and provide a map of the designated areas.
 

 NSG counters that the above restrictions impermissibly impede its ability to get signatures. According to NSG, the typical volunteer or “paid per signature” status of petition circulators makes it very difficult to make long-term plans and to coordinate signature-gathering times and locations, and the advance notice and form fill-out policies discourage would-be circulators from deciding, on any given day, to go out and collect signatures. NSG characterizes as unduly burdensome the RTC guidelines’ provision stating that the area should be in an area avoidable by patrons and UNLV’s placement of expressive-activity areas away from Ham Hall’s exits, allegedly off UNLV property, given the fact that signatures often have to be directly solicited. Accordingly, NSG argues that it should not be required to agree to abide by the rules, because in doing so, it would in effect be agreeing to their validity.
 

 We conclude that, under the First Amendment, the above time, place, and manner regulations are permissible restrictions related to legitimate government safety and functional operating purposes. There is nothing inherently unreasonable in requiring a petition cir-culator to provide advance notice of his or her intended signature-gathering activities. Advance notice serves a variety of purposes, including enabling building operators to better accommodate multiple signature gatherers and individual petition circulators’ particular needs, and to have a chance to make other employees aware of the intended signature-gathering activities so that they will be able to adjust their duties accordingly.
 

 Additionally, the RTC and UCCSN requirements that a signature gatherer provide his or her contact information before being allowed to use RTC and UCCSN property are reasonable. The information is for internal use and does not affect signature gatherers’ choices to remain anonymous to the general public or appear to make them more susceptible to public harassment or retaliation. Rather, the requested information is reasonably related to RTC and UCCSN aims of accommodating all requestors and unusual circumstances while maintaining safe and efficient operations of their affairs.
 

 RTC’s requirement that the subject matter of the petition be revealed is reasonably related to the advancement of its intent to maintain limited public forum status by permitting only NRS Chapter 293 petition circulators to engage in signature-gathering
 
 *729
 
 activities on its premises, in accordance with NRS 293.127565.
 
 [48]
 
 Although RTC asserts that it may use the information to act based on the content of the petition, for example, to provide additional security if deemed necessary, there is no indication that it uses the information in order to deny any signature gatherer access.
 

 Further, RTC and UNLV requirements that circulators obtain “approval” or “authorization” before using the premises is apparently based on completion of the above requirements, not on the content of the petition or the viewpoint of the petition circulator. Thus, those requirements are also reasonable means of controlling access to the limited public forums, thereby enforcing valid restrictions in light of appellants’ principal operations.
 
 [49]
 
 Similar requirements have been upheld by other jurisdictions.
 
 [50]
 

 Although the exact location of UNLV’s designated expressive-activities area during the Ham Hall incident is unclear, its desire to keep petition circulators from directly blocking the building’s exits is reasonably related to its purpose of maintaining safety and order at the high-security event. Similarly, noting the congestion difficulties that the CitiCenter faces and the bus-transfer methods currently employed there, the RTC guideline provision establishing the designated area in a location avoidable by patrons is reasonably related the CitiCenter’s purpose as a transportation facility. Finally, it follows that RTC’s requirement that a requestor sign the request form, thereby agreeing to abide by its constitutionally permissible guidelines, is likewise reasonable.
 
 [51]
 

 
 *730
 
 As the above discussion demonstrates, none of the RTC and UCCSN time, place, and manner restrictions challenged by NSG discriminates amongst petition circulators based on the content of the petition or the viewpoint of the petition’s promoter. Further, all of the restrictions are reasonable and all are related to RTC’s and UCCSN’s goals of promoting safety and efficiency in conducting, respectively, their legitimate transportation and education purposes. Finally, we note that there is no indication that either RTC or UCCSN policies were applied to NSG in a discriminatory manner. Accordingly, we move on to NSG’s statutory-based arguments.
 

 II. Statutory challenge
 

 NSG argues that NRS 293.127565 grants petition circulators broader “free speech” rights than those protected by the First Amendment.
 
 [52]
 
 NRS 293.127565 provides:
 

 Use of public buildings to gather signatures on petitions; regulations.
 

 1. At each building that is open to the general public and occupied by the government of this state or a political subdivision of this state or an agency thereof, other than a building of a public elementary or secondary school, an area must be made available for the use of any person to gather signatures on a petition at any time that the building is open to the public. The area must be reasonable and may be inside or outside of the building. Each public officer or employee in control of the operation of a building governed by this subsection shall designate and approve the area required by this subsection for the building.
 

 2. Before a person may use an area designated pursuant to subsection 1, the person must notify the public officer or employee in control of the operation of the building governed by subsection 1 of the dates and times that the person intends to use the area to gather signatures on a petition. The public officer or employee may not deny the person the use of the area.
 

 3. A person aggrieved by a decision made by a public officer or employee pursuant to subsection 1 may appeal the de-
 
 *731
 
 cisión to the Secretary of State. The Secretary of State shall review the decision to determine whether the public officer or employee designated a reasonable area as required by subsection 1.
 

 As discussed above, the government is not required to grant access to government premises for expressive-activity purposes when the premises have not traditionally been open for such purposes. Thus, to the extent that the statute permits petition circula-tors to access government-occupied premises that have not traditionally been accessible for expressive activities, NSG’s assertion is correct.
 
 [53]
 

 Statutory construction
 

 In construing a statute, it is well-established that a court should consider multiple legislative provisions as a whole,
 
 [54]
 
 and the language of a statute should be given its plain meaning unless doing so “violates the spirit of the act.”
 
 [55]
 
 Thus, when “a statute is clear on its face, a court may not go beyond the language of the statute in determining the legislature’s intent.”
 
 [56]
 
 A statute is ambiguous, however, when it “is capable of being understood in two or more senses by reasonably informed persons.’ ’
 
 [57]
 
 When a statute is ambiguous, a court may look to reason and public policy to determine what the legislature intended.
 
 [58]
 
 “The meaning of the words used may be determined by examining the context and the spirit of the law or the causes which induced the legislature to enact it.”
 
 [59]
 
 Finally, a statute must be examined as a whole and, if possible, read to give meaning to all of its provisions.
 
 [60]
 

 UCCSN asserts that UNLV rented Ham Hall to a private party for a private function and, therefore, it was not “occupied” by the government.
 
 [61]
 
 Because the statute only applies to state-
 
 *732
 
 government-occupied buildings, and the hall was leased to a private, nonstate-government entity, UCCSN argues that NRS 293.127565 does not apply to UNLV in the present situation.
 
 [62]
 

 NRS 293.127565, which applies only to buildings “occupied by the government of this state” and its subdivisions and agencies, is ambiguous because “occupied” generally refers to the act of being in possession or residence.
 
 [63]
 
 Although UNLV possesses Ham Hall in the greater sense, the hall was physically occupied, on the afternoon in question, by a private party. Consequently, the statute could reasonably be interpreted in more than one way. A review of NRS 293.127565’s legislative history, however, reveals that it was only intended to apply to buildings that are physically occupied by the government at the time in question.
 

 The statute was enacted by Assembly Bill 443.
 
 [64]
 
 Originally, the bill applied to “buildings owned and occupied” by the government.
 
 [65]
 
 After some concern that a building merely leased by the government would thereby be excluded, it was proposed that the language be changed to “owned
 
 or
 
 occupied.” It was noted that the disjunctive would “significantly broaden the number of allowed sites.”
 
 [66]
 
 Finally, the “owned or” was removed, and the language was changed to its current form.
 
 [67]
 
 We thereby recognize the Legislature’s intent, whether or not a building is owned by the government, to include within the statute’s reach only buildings actually physically occupied by the government during the desired period of signature gathering, and to exclude those buildings when they are occupied by private parties. On public policy grounds, this
 
 *733
 
 construction is reasonable as well; requiring buildings to be available for signature gathering, no matter who actually possesses the building at the time in question, could not only place the government in an untenable position, it could also create serious safety issues for the building’s patrons and signature gatherers alike. Accordingly, UNLV’s Ham Hall is not, in this instance, subject to the provisions of NRS 293.127565.
 

 Time, place, and manner restrictions in light of NRS 293.127565
 

 Appellants assert that even if the statute applies to them, it neither provides petition circulators additional protections beyond the First Amendment, nor abrogates their rights to impose reasonable restrictions on circulators’ activities. In contrast, NSG maintains that notwithstanding any restrictions’ constitutional validity, because the statute provides that the person in control “may not deny” petition circulators use of the designated area,
 
 [68]
 
 appellants may never refuse circulators an area for failure to comply with all of their restrictions. NSG reads too much into this language.
 

 Taken out of context, this language is ambiguous. When read within the context of the statutory provision as a whole, however, the “may not deny” language simply limits discretion and thereby prohibits viewpoint-based discrimination in government-occupied buildings. In other words, this provision reiterates that
 
 all
 
 NRS Chapter 293 petition circulators have a right to access public buildings, regardless of the petition’s content or the petitioner’s viewpoint. Nothing in NRS 293.127565’s “may not deny” language prohibits the government from imposing constitutionally permissible time, place, and manner restrictions on signature-gathering activities in areas included within the statute’s reach.
 

 Nonetheless, even though a time, place, or manner restriction may be constitutionally valid, it might not necessarily comport with the spirit and intent of NRS 293.127565. The background of Assembly Bill 443 demonstrates that it was created in response to some of the difficulties petition circulators had encountered when attempting to gather signatures at government buildings.
 
 [69]
 
 The aims behind Bill 443 were not only to “make clear petitioning was indeed legal’ ’ at government buildings open to the public, but also to give both building operators and signature gatherers guidance as to the anticipated expectations of the other.
 
 [70]
 
 As noted by the
 
 *734
 
 United States Supreme Court, “ ‘[t]he securing of sufficient signatures to place an initiative [or referendum] measure on the ballot is no small undertaking.’”
 
 [71]
 
 Yet the right to initiate change in this state’s laws through ballot proposals is one of the basic powers enumerated in this state’s constitution. Accordingly, NRS 293.127(l)(c) expresses the state’s public policy that election laws, enumerated in NRS Chapter 293, should be liberally construed to effectuate the will of the people. Correspondingly, any time, place, or manner restriction associated with buildings to which NRS 293.127565 pertains must not work unreasonably, in light of the totality of the circumstances, so as to deny a petition circulator his or her right to gather signatures.
 

 In this instance, the enforcement of the RTC restriction requiring a petition circulator to agree to abide by its guidelines, when viewed in conjunction with the language of two of the guidelines’ provisions, worked to unreasonably deny NSG its statutory right to use the CitiCenter for signature-gathering purposes. In particular, RTC violated NSG’s statutory rights when it denied access to the CitiCenter to gather signatures based on NSG’s refusal to sign the form indicating its consent to abide by the three-day advance notice requirement and the provision regarding the designation of an area that allows patrons to completely avoid petition circulators.
 

 RTC guidelines mandate that circulators provide three days’ notice of any intended signature-gathering activities.
 
 [72]
 
 Although RTC testified that it does not actually need three days to prepare for petition circulators, and that most signature-gathering activity is approved within two hours, the guidelines did not indicate that the three-day requirement could be shortened.
 

 Nothing in NRS 293.127565 bars the government from requiring notice in advance; indeed, there may be instances in which advance notice is absolutely necessary to maintain the government building’s functional operations. Nonetheless, depending on the particular circumstances involved, the strict application of a precise advance notice requirement may unreasonably deny petition circu-lators’ their statutory right to gather signatures in government buildings. The spirit and intent with which NRS 293.127565 was enacted prohibits such a strict application. Therefore, to the extent to which the language of RTC’s three-day advance notice requirement mandates strict compliance, the provision is unreasonable under the statute.
 

 
 *735
 
 Further, the RTC provision dictating that a designated area should be one that may be completely avoided by the public could defeat the public building accessibility purposes of the statute altogether. As NSG notes, signature gatherers often have to solicit signers. The enforcement of a restriction allowing the government to locate signature-gathering areas so as to afford signature gatherers no exposure to the public would unreasonably deny petition cir-culators’ their statutory rights. Therefore, this provision is also unreasonable under the statute.
 

 It is no surprise, therefore, that NSG petitioners were unwilling to sign a form agreeing to abide by RTC guidelines. Signing the form, in effect, would have indicated NSG’s consent with any action RTC then took to disallow its immediate activities, since NSG had not provided three days’ notice, even though NSG had attempted to provide at least some notice.
 
 [73]
 
 In addition, signing the form would, in effect, have indicated its consent to abide by any RTC decision to locate the designated area in an unacceptable place, thereby arguably limiting its statutory right to appeal the reasonableness of the designated area.
 
 [74]
 
 Therefore, we conclude that, under these particular circumstances, the enforcement of RTC’s guidelines by requiring NSG petition circulators to sign the RTC request form unreasonably denied NSG the full enjoyment of the statutory right to gather signatures at the RTC CitiCenter building.
 

 CONCLUSION
 

 Although RTC’s and UCCSN’s time, place, and manner restrictions are constitutionally valid, NRS 293.127565 must be liberally construed to effect its intent to provide petition circulators areas at
 
 *736
 
 public buildings in which to conduct signature-gathering activities. Therefore, a time, place, and manner restriction that applies to buildings under the statute’s purview must also comport with the spirit and intent of NRS 293.127565 in light of the particular circumstances. Three of RTC’s guidelines worked to unreasonably deny NSG its statutory right to gather signatures. However, UNLV’s Ham Hall, occupied by a private party for a private event, does not come within the statute’s purview. Accordingly, we affirm that portion of the preliminary injunction relating to RTC, to the extent that it relates to the guidelines discussed above, and reverse that portion of the preliminary injunction pertaining to UCCSN.
 

 [2]
 

 See
 
 Nev. Const, art. 19, § 1(2) (providing that a referendum signed by registered voters equaling ten percent or more of the number of voters who voted at the preceding general election must be submitted for a vote when filed with the Secretary of State no later than 120 days before the next general election);
 
 id.
 
 §§ 2(2), (4) (essentially providing that an initiative proposing a constitutional amendment and signed by registered voters equaling ten percent or more of the voters who voted at the preceding general election in seventy-five percent of the counties and the entire state must be filed with the Secretary not less than 90 days before the general election); NRS 295.056(3), (4) (requiring petitions for constitutional amendment initiatives and referendums to be submitted to the county clerks for signature verification by the third Tuesday in June and the third Tuesday in May, respectively).
 

 [3]
 

 RTC representatives testified that the guidelines have since been amended to provide for RTC’s response within one business day, but that it has never taken longer than two hours to respond to a request.
 

 [4]
 

 See Arizonans for Official English v. Arizona,
 
 520 U.S. 43, 67 (1997);
 
 Lewis v. Continental Bank Corp.,
 
 494 U.S. 472, 477-78 (1990).
 

 [5]
 

 NCAA v. University of Nevada,
 
 97 Nev. 56, 57, 624 P.2d 10, 10 (1981).
 

 [6]
 

 Wedekind
 
 v.
 
 Bell,
 
 26 Nev. 395, 413-15, 69 P. 612, 613-14 (1902).
 

 [7]
 

 Traffic Control Servs. v. United Rentals,
 
 120 Nev. 168, 171-72, 87 P.3d 1054, 1057 (2004) (recognizing that the “capable of repetition, yet evading review” exception to the mootness doctrine applies when the duration of the challenged action is “relatively short,” and there is a “likelihood that a similar issue will arise in the future”).
 

 [8]
 

 Round Hill Gen. Imp. Dist. v. Newman,
 
 97 Nev. 601, 604, 637 P.2d 534, 536 (1981) (noting that when factual, rather than legal, issues are presented, this court will not exercise its discretion to consider an original extraordinary writ petition, even when important public interests are involved).
 

 [9]
 

 Attorney General v. NOS Communications,
 
 120 Nev. 65, 67, 84 P.3d 1052, 1053 (2004);
 
 S.O.C., Inc. v. The Mirage Casino-Hotel,
 
 117 Nev. 403, 407, 23 P.3d 243, 246 (2001);
 
 Dangberg Holdings v. Douglas Co.,
 
 115 Nev. 129, 142-43, 978 P.2d 311, 319 (1999).
 

 [10]
 

 Id.
 

 [11]
 

 S.O.C., Inc.,
 
 117 Nev. at 407, 23 P.3d at 246.
 

 [12]
 

 Id.
 
 at 408, 23 P.3d at 246 (citing
 
 Dangberg Holdings,
 
 115 Nev. at 142-43, 978 P.2d at 319).
 

 [13]
 

 See, e.g., Clark Co. School Dist.
 
 v.
 
 Buchanan,
 
 112 Nev. 1146, 1150, 924 P.2d 716, 719 (1996).
 

 [14]
 

 Neither appellant contests “state actor” status.
 

 [15]
 

 Meyer v. Grant,
 
 486 U.S. 414, 420 (1988) (quoting the First Amendment to the United States Constitution).
 

 [16]
 

 S.O.C., Inc.,
 
 117 Nev. at 415, 23 P.3d at 251.
 

 [17]
 

 See id.
 

 [18]
 

 Meyer,
 
 486 U.S. at 422.
 

 [19]
 

 Id.
 
 at 425 (quotation marks omitted).
 

 [20]
 

 Cornelius
 
 v.
 
 NAACP Legal Defense & Ed. Fund,
 
 473 U.S. 788, 799-800 (1985).
 

 [21]
 

 International Soc. for Krishna Consciousness, Inc. v. Lee,
 
 505 U.S. 672, 678-79 (1992);
 
 see also Perry Ed. Assn. v. Perry Local Educators’ Assn.,
 
 460 U.S. 37 (1983).
 

 [22]
 

 S.O.C., Inc.,
 
 117 Nev. at 411-12, 23 P.3d at 249 (quoting
 
 Perry Ed. Assn.,
 
 460 U.S. at 45).
 

 [23]
 

 Krishna Consciousness,
 
 505 U.S. at 679-80.
 

 [24]
 

 Id.
 
 at 680.
 

 [25]
 

 Id.
 

 [26]
 

 PMG Intern. Div. L.L.C. v. Rumsfeld,
 
 303 F.3d 1163, 1170 (9th Cir. 2002) (quoting
 
 General Media Communications, Inc. v. Cohen,
 
 131 F. 3d 273, 279 (2d Cir. 1997) (quoting
 
 Cornelius,
 
 473 U.S. at 802)).
 

 [27]
 

 Perry Ed. Assn.,
 
 460 U.S. at 45-46.
 

 [28]
 

 Hills
 
 v.
 
 Scottsdale Unified School Dist. No. 48,
 
 329 F.3d 1044, 1049 (9th Cir. 2003).
 

 [29]
 

 Id.
 
 (quoting
 
 DiLoreto v. Downey Unified School Dist. Bd. Educ.,
 
 196 F.3d 958, 965 (9th Cir. 1999)). We note that some courts differentiate between “designated” and “limited” public forums, while others treat them as indistinguishable.
 
 See, e.g., Chiu
 
 v.
 
 Plano Independent School Dist.,
 
 260 F.3d 330,
 
 *724
 
 345-46 (5th Cir. 2001) (noting that “designated public forum” and “limited public forum” are terms “not synonymous and should not be used interchangeably”);
 
 Hopper
 
 v.
 
 City of Pasco,
 
 241 F.3d 1067, 1074-75 (9th Cir. 2001) (differentiating between designated and limited public forums, but recognizing the inconsistency);
 
 cf. Currier v. Potter,
 
 379 F.3d 716, 728 n.8 (9th Cir. 2004) (treating the terms as indistinguishable without noting the above Ninth Circuit decisions);
 
 S.O.C., Inc.,
 
 117 Nev. at 411-12, 23 P.3d at 248 (recognizing three types of forums identified by the United States Supreme Court: traditional public, designated public, and nonpublic).
 

 [30]
 

 Hills,
 
 329 F.3d at 1049.
 

 [31]
 

 Rosenberger
 
 v.
 
 Rector and Visitors of Univ. of Va.,
 
 515 U.S. 819, 829 (1995).
 

 [32]
 

 Hills,
 
 329 F.3d at 1049.
 

 [33]
 

 Cornelius,
 
 473 U.S. at 808.
 

 [34]
 

 Id.
 
 at 802;
 
 see also Hills,
 
 329 F.3d at 1049.
 

 [35]
 

 See
 
 Cornelius,
 
 473 U.S. at 804.
 

 [36]
 

 Id. at 801.
 

 [37]
 

 See Bolinske v. North Dakota State Fair Ass’n,
 
 522 N.W.2d 426 (N.D. 1994) (applying a forum analysis to a regulation limiting speech activities at a state fair).
 

 [38]
 

 Cf.
 
 Lehman
 
 v.
 
 City of Shaker Heights,
 
 418 U.S. 298, 303-04 (1974) (plurality opinion) (noting that the city’s transportation system involved commercial activities designed to promote the effective, safe, and pleasant transport of passengers and holding that its buses’ advertisement spaces were not a public forum).
 

 [39]
 

 See
 
 NRS 293.127565(1).
 

 [40]
 

 Hills,
 
 329 F.3d at 1049;
 
 see also Cornelius,
 
 473 U.S. at 803.
 

 [41]
 

 RTC representatives testified that approximately 8,000 passengers pass through the CitiCenter hub each day. Further, RTC noted that the CitiCenter operates on a “pulse system,” which results in high, often hectic, congestion at a certain given time.
 

 [42]
 

 See Widmar v. Vincent,
 
 454 U.S. 263 , 267 n.5 (1981) (noting that, although, for its students, a public university is like a public forum, the Court has never held “that a campus must make all of its facilities equally available to students and nonstudents alike, or that a university must grant free access to all of its grounds or buildings”).
 

 [43]
 

 See, e.g., Pro-Life Cougars v. University of Houston, 259 F.
 
 Supp. 2d 575, 582 (S.D. Tex. 2003) (determining that the university and plaza “are public fora designated for student speech”);
 
 cf. Bourgault v. Yudof,
 
 316 E Supp. 2d 411, 420 (N.D. Tex. 2004) (concluding that a university that allowed only university community members to engage in expressive activities on its property created a limited public forum).
 

 [44]
 

 See
 
 e.g., ACLU Student Chapter
 
 v.
 
 Mote,
 
 321 F. Supp. 2d 670, 679 (D. Md. 2004) (concluding that a university campus became a limited public forum when it “purposefully opened its doors” through policies allowing speech activities by outsiders on campus only upon invitation of an insider, or in certain designated areas);
 
 see also Widmar,
 
 454 U.S. at 267 n.5 (noting that “decisions of this Court have never denied a university’s authority to impose reasonable regulations compatible with [its] mission upon the use of its campus and facilities”).
 

 [45]
 

 736 N.E.2d 48, 51 (Ohio Ct. App. 1999).
 

 [46]
 

 Id.
 
 at 53;
 
 see also Khademi
 
 v.
 
 South Orange County Community College,
 
 194 F. Supp. 2d 1011, 1024 (C.D. Cal. 2002) (noting that “[t]here is no doubt that the fora at issue — the facilities and areas which the college has made generally available for use by students and the community at large — have been opened up to the public,” and applying strict scrutiny to the restrictions imposed on expressive activities in those areas);
 
 cf. Hays County Guardian v. Supple,
 
 969 F.2d 111, 114 (5th Cir. 1992) (analyzing restrictions applied to student speech and recognizing that, when university policy allows “any group or person” to engage in expressive activities on its campus, the university is a designated public forum).
 

 [47]
 

 Rosenberger
 
 v.
 
 Rector and Visitors cf Univ. of Va.,
 
 515 U.S. 819, 829 (1995);
 
 see also Capital Leasing of Ohio
 
 v.
 
 Columbus Mun. Airport,
 
 13 F. Supp. 2d 640, 661 (S.D. Ohio 1998) (noting that “a standard of review based on reasonableness is fact-based and is dependent on all the circumstances surrounding [a time, place, and manner] restriction and the reason for its imposition”).
 

 [48]
 

 NSG argues that NRS 293.127565 applies to any petition whatsoever, and, therefore, it is unnecessary for appellants to inquire about a petition’s subject. NSG reasons that the statute’s language granting access to “any person” gathering signatures on “a petition” clearly defeats the assumption that the statute only applies to NRS Chapter 293 petitions, despite its inclusion under NRS Chapter 293. NSG is mistaken as to the scope of NRS 293.127565. The statute’s inclusion in NRS Chapter 293 clearly denotes its application to a person gathering signatures on any petition to be submitted for placement on a ballot during any election governed by NRS 293, including the initiative, referendum, and recall petitions pertaining to cities,
 
 see
 
 NRS 293.126, counties, and the state, and there is no indication that it was intended to apply to matters beyond the reach of NRS Chapter 293.
 

 [49]
 

 Permit requirements are not “per se” unconstitutional; similar requirements have been upheld even under strict scrutiny.
 
 See, e.g., Thomas v. Chicago Park Dist.,
 
 534 U.S. 316 (2002).
 

 [50]
 

 See, e.g., Bolinske,
 
 522 N.W.2d 426 (concluding that a regulation requiring petition circulators to submit an application for booth rental at a state fair is constitutional);
 
 Spingola,
 
 736 N.E.2d 48 (affirming the constitutionality of a university’s regulation mandating that a requestor fill out a reservation form);
 
 Mote,
 
 321 F. Supp. 2d at 681 (“What [the speaker] seeks is the freedom to roam the University campus at will and hand out leaflets to University students, something which the Constitution does not permit him to do.”).
 

 [51]
 

 We recognize that a facially content-neutral, reasonable restriction may be unconstitutionally applied in a discriminatory manner. To the extent that NSG asserts that appellants’ policies were being applied to NSG signature gatherers
 
 *730
 
 in a discriminatory manner such that other circulators were allowed to collect signatures at government locations, while it was denied access, NSG has failed to demonstrate that any other person or group similarly refused to comply with any of the agencies’ policies, but was nonetheless permitted to circulate a petition on RTC or UCCSN premises. Therefore, there is no indication that appellants’ policies were in this manner applied unconstitutionally to NSG.
 

 [52]
 

 See S.O.C., Inc.,
 
 117 Nev. at 414, 23 P.3d at 250 (noting that states may afford individual rights greater protections than the minimum protections established by the Federal Constitution).
 

 [53]
 

 No party to this appeal challenges the constitutionality of NRS 293.127565.
 

 [54]
 

 Diamond
 
 v.
 
 Swick,
 
 117 Nev. 671, 676, 28 P.3d 1087, 1090 (2001).
 

 [55]
 

 McKay v. Bd. of Supervisors,
 
 102 Nev. 644, 648, 730 P.2d 438, 441 (1986).
 

 [56]
 

 Id.
 

 [57]
 

 Id.
 
 at 649, 730 P.2d at 442.
 

 [58]
 

 Id.
 

 [59]
 

 Id.
 
 at 650-51, 730 P.2d at 443.
 

 [60]
 

 Building & Constr. Trades
 
 v.
 
 Public Works,
 
 108 Nev. 605, 610, 836 P.2d 633, 636 (1992).
 

 [61]
 

 As noted above, RTC concedes that the CitiCenter is subject to NRS 293.127565.
 

 [62]
 

 NSG counters that it was not attempting to access Ham Hall to gather signatures, but rather the campus grounds outside the building, and that, by specifically exempting elementary and secondary schools from the statute’s reach, the “statute obviously includes University campuses in its reach.” NSG’s argument fails to acknowledge the statute’s application to “buildings” only, and thus fails to demonstrate how campus grounds are “buildings” included in the statute. It further appears that the statute was not intended to apply to all government property, but rather to government-occupied buildings.
 
 See, e.g.,
 
 Hearing on A.B. 443 Before the Senate Comm, on Government Affairs, 71st Leg. (Nev., May 9, 2001); 2 Journal S., 71st Sess. 1697 (Nev. 2001). In this opinion, we do not reach the question of whether and to what extent NRS 293.127565 applies to university facilities that are not occupied by private parties for private purposes.
 

 [63]
 

 See, e.g., Webster’s New Collegiate Dictionary
 
 817 (9th ed. 1983) (defining “occupy” as “to take or hold possession of” and “to reside in as an owner or tenant”).
 

 [64]
 

 2001 Nev. Stat., ch. 294, § 2, at 1347.
 

 [65]
 

 Hearing on A.B. 443 Before the Senate Comm, on Government Affairs, 71st Leg. (Nev., May 9, 2001); 2 Journal S., 71st Sess. 1697 (Nev. 2001).
 

 [66]
 

 Hearing on A.B. 443 Before the Senate Comm, on Government Affairs, 71st Leg. (Nev., May 9, 2001).
 

 [67]
 

 See id;
 
 2 Journal S., 71st Sess. 1697 (Nev. 2001).
 

 [68]
 

 NRS 293.127565(2).
 

 [69]
 

 Hearing on A.B. 443 Before the Assembly Comm, on Elections, Procedures, and Ethics, 71st Leg. (Nev., Apr. 3, 2001).
 

 [70]
 

 Id.
 

 [71]
 

 Meyer,
 
 486 U.S. at 423 (quoting
 
 State v. Conifer Enterprises, Inc.,
 
 508 P.2d 149, 155 (Wash. 1973) (Rosellini, J., dissenting) (internal quotation marks omitted)).
 

 [72]
 

 Again, we note that RTC guidelines now require only two days’ notice.
 

 [73]
 

 Appellants contend that NSG’s failure to fully comply with the statute’s notice requirements by notifying “the officer or employee in charge” thereby excused them from taking any further action to execute the statute’s directives. This argument is overly technical. Although it is undisputed that NSG signature gatherers failed to directly notify appellants’ designees as NRS 293.127565(2) requires, they did attempt to provide notice. The NSG director testified that she was referred to RTC’s legal counsel, who personally responded to her voicemail and only faxed her forms with the appropriate person’s name at the bottom. The NSG circulator at Ham Hall testified that he approached a UNLV police officer, who addressed his request without directing him to anyone else. Thus, it appears that all circulators substantially complied with the requirement that they notify the responsible person, and that appellants’ assertions are without merit. Additionally, although UCCSN is not required, in this instance, to comply with NRS 293.127565, we note that the district court’s instructions directing appellants to provide, immediately upon circulators’ arrival, the contact information of each respective building’s supervisor, and directing appellants to maintain the supervisor or a designee on site at all times that their properties are open to the public, would appear to reasonably resolve any future issues of this nature.
 

 [74]
 

 See
 
 NRS 293.127565(3).